569 S.E.2d 809

**STATE of West Virginia ex rel. Michael M. McKENZIE, Petitioner,**

v.

**Robert J. SMITH, Commissioner, Bureau of Employment Programs, Workers' Compensation Division, and Simonton Building Products, Inc., Respondents.**

No. 29645.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 22, 2002.

Decided June 28, 2002.

Dissenting Opinion of Justice Maynard July 9, 2002.

Dissenting Opinion of Chief Justice Davis July 17, 2002.

Robert F. Cohen, Jr., Esq., Cohen, Abate & Cohen, L.C., Morgantown, for the Petitioner.

James M. Robinson, Esq., Robinson & Rice, L.C., Huntington, Amicus Curiae.

Grant Crandall, Esq., United Mineworkers of America, Fairfax, for Amicus Curiae United Mineworkers of America.

Thomas P. Maroney, Esq., West Virginia State Labor Federation, AFL–CIO, Charles-

ton, for Amicus Curiae West Virginia State Labor Federation, AFL–CIO.

Richard M. Crynock, Esq., Bureau of Employment Programs, Charleston, for Respondent Robert J. Smith.

Ancil G. Ramey, Esq., Misty L. Heitz, Esq., Steptoe & Johnson, PLLC, Charleston, for Respondent Simonton Building Products, Inc.

Timothy E. Huffman, Esq., Jackson & Kelly, Charleston, for Amicus Curiae West Virginia Business and Industry Council.

STARCHER, Justice.

The instant case is a petition seeking a writ of mandamus directed to Robert J. Smith, the Commissioner of the West Virginia Workers' Compensation Division ("Commissioner"). The Commissioner is charged with disbursing the Workers' Compensation Fund to workers who receive injuries in the course of and resulting from their employment. *W.Va.Code,* 23–4–1 [1989].

The petitioner seeks a writ of mandamus to compel the Commissioner to abide by certain provisions of the Workers' Compensation Act regarding rehabilitation services, and to prevent the Commissioner's further reliance upon regulations and internal policies and procedures which mandate that injured workers seeking rehabilitation be referred to their employer's "preferred provider for rehabilitation services."

As set forth below, we find that the Commissioner's and Workers' Compensation Division's system of using an employer's preferred provider for rehabilitation services to be contrary to the provisions of the Act. We therefore grant the requested writ of mandamus.

## I.

### Facts & Background

The instant case revolves around the petitioner's repeated attempts, beginning in March 1999, to obtain vocational rehabilitation services from the West Virginia Workers' Compensation Division ("the Division"). More importantly, the case is focused on the legality of the Division's regulations, policies and procedures mandating the referral of the petitioner to the "employer's preferred provider for rehabilitation services." We begin, however, by discussing the petitioner's on-the-job injury and subsequent treatment.

The petitioner, Michael M. McKenzie, was employed as a packer for the respondent, Simonton Building Products ("Simonton"), at its facility in Pennsboro, West Virginia. The petitioner's job required that he lift and carry windows up to 68 inches wide and weighing 150 pounds.

On October 2, 1998, the petitioner strained his back at work. The petitioner continued to work, but when the pain in his back worsened, he consulted with a chiropractor. Afterward, on November 4, 1998, he filed a claim for workers' compensation benefits with the Division.

An MRI of the petitioner's back revealed that the petitioner had a ruptured disk in his lower back involving a nerve root. The chiropractor advised the petitioner to cease work, which he did. The Division, in an order dated November 26, 1998, ruled the petitioner's claim compensable and awarded the petitioner temporary total disability benefits from December 1, 1998 through March 23, 1999.

The petitioner was released to return to a limited work schedule on March 10, 1999. The petitioner's chiropractor gave the petitioner a note which limited the petitioner to working four hours a day with no lifting, twisting or bending for two weeks, and then eight hours a day with no lifting, twisting or bending for three months, at which time he would be re-evaluated. The petitioner took the note to the safety manager at Simonton, but was told that there was no job available which required only four hours a day. The petitioner then sought employment with other companies, and obtained a job on July 7, 1999 installing telephone and computer wiring. However, the petitioner stopped working on July 30, 1999 because of severe back pain.

In August 1999, the Division issued an authorization for the petitioner to have back surgery, and a lumbar laminectomy and diskectomy was performed on the petitioner in

September. Additionally, the petitioner received temporary total disability benefits from September 1, 1999 through April 5, 2000. The petitioner was examined by a doctor in February 2000, and based upon the doctor's report, the Division granted the petitioner a 15% permanent partial disability on June 26, 2000.

The petitioner contends that during his recovery from his October 2, 1998 injury, he requested on three occasions that the Division authorize that he receive rehabilitation services.

### A.

#### Petitioner's First Attempt to Receive Rehabilitation Services

In March 1999, after being released to return to work but being informed by Simonton's safety manager that no work was available within the petitioner's medical limitations, the petitioner contacted his claims representative at the Division. The petitioner discussed with the claims representative the possibility of vocational rehabilitation, and on March 16, 1999, the Division entered an order referring the claimant to Quality Rehabilitation Services, Inc. ("QRS"). The record suggests that QRS had been designated as Simonton's "preferred provider for rehabilitation services" by the Division, and was the exclusive provider for rehabilitation services for Simonton employees.

Several days later, an employee of QRS spoke with respondent Simonton, and was told by Simonton that the petitioner was not eligible for vocational rehabilitation services. Simonton stated that the petitioner was a "seasonal" employee—that is, his job lasted only so long as the company was working on a particular project. Apparently, all "seasonal" employees were laid off from Simonton in December 1998, approximately one month

after the petitioner stopped working due to his injury, and the seasonal employees were told there would be no position after the project was completed.

The record indicates that Simonton related to the QRS employee its concern that the petitioner was receiving *any* workers' compensation benefits as a "seasonal" employee, and stated that the petitioner "is not eligible for vocational rehabilitation services due to the position being a seasonal position[.]" In response, the QRS employee agreed to contact the Division on Simonton's behalf "to correct eligibility matters."

The record reflects that on March 23, 1999, QRS contacted the petitioner's claims representative at the Division, and informed the claims representative that the petitioner "was hired as a seasonal employee and would not be eligible for vocational rehabilitation services due to this fact." The claims representative agreed that "if Mr. McKenzie was a seasonal employee then Mr. McKenzie would not be eligible for vocational rehabilitation services." That same day, the petitioner was contacted by the claims representative and told that he was not eligible for vocational rehabilitation benefits.

■ Subsequently, the petitioner hired an attorney. The petitioner's attorney contacted the claims representative's supervisor at the Division, and the supervisor acknowledged that the Division was wrong in denying vocational rehabilitation services to the petitioner because he was a seasonal employee.[1] However, no action was taken because the petitioner was planning to have back surgery.

Following the petitioner's back surgery in September 1999, a letter by the petitioner's surgeon was sent to the Division recommending "some vocational retraining ... through

---

1. The Workers' Compensation Act does not contain any limitation concerning "seasonal employees," and states that employees subject to the Act "are all persons in the service of employers and employed by them for the purpose of carrying on the industry, business, service or work in which they are engaged[.]" *W.Va.Code*, 23–2–1a [1991].

Employers subject to the Act include "all persons, firms, associations and corporations regularly employing another person or persons for the purpose of carrying on any form of industry, service or business in this state[.]" *W.Va.Code*, 23–2–1(a) [1995]. The definition does exclude "casual" employees, but only if the number of employees "does not exceed three and the period of employment is temporary, intermittent and sporadic in nature and does not exceed ten calendar days in any calendar quarter." *W.Va. Code*, 23–2–1(b)(4) [1995].

workman's compensation." The record suggests that the letter was received by the petitioner's claims representative; it is not clear what action, if any, the Division took in response to the letter.

## B.

### Petitioner's Second Attempt to Receive Rehabilitation Services

On November 10, 1999, a letter was sent to the petitioner's claims representative by an administrator for Simonton. The letter stated that the Simonton administrator had "received correspondence from ... WC that stated the claimant is indeed eligible for rehabilitation services." The Simonton letter then asked the Division claims representative to refer the petitioner to Recourse, Inc., "the employer's preferred provider for rehabilitation" because Simonton "had all their claims transferred from QRS to Recourse months ago."

In an order dated January 28, 2000, the Division referred the petitioner to Recourse, Inc. ("Recourse") for rehabilitation services.

A rehabilitation counselor for Recourse subsequently interviewed the petitioner, and the petitioner clearly expressed both a desire to return to work and a desire for vocational rehabilitation services.

The rehabilitation counselor informed the petitioner, in several meetings, that his rehabilitation would proceed according to a seven-step "rehabilitation hierarchy." This hierarchy is mandated through regulations implemented by the Division.[2] The regulation simply begins by stating that if the Workers' Compensation Commissioner determines that an injured worker cannot complete a lower-numbered step in the hierarchy, then the next higher-numbered step must be used. The first four steps of the rehabilitation hierarchy require returning the injured worker to work with the same employer, at the same or different positions and with varying degrees of retraining. The next two steps require that the injured worker be employed by a new employer, step five without retraining, and step six with retraining. The final step of the hierarchy, step seven, requires that the injured worker be enrolled in a retraining program designed to lead to suitable gainful employment in the labor market.

The Recourse rehabilitation counselor also spoke with Simonton, and determined that Simonton did provide light and modified duty work to its employees. However, Simonton indicated to the rehabilitation counselor—as it had previously advised QRS—that the petitioner's job with the company had been terminated, along with the positions of other seasonal employees, on December 18, 1998.

After multiple meetings with the petitioner and his counsel, and several phone calls to Simonton, the rehabilitation counselor determined that the petitioner was not eligible to receive vocational rehabilitation services.

---

2. The regulation, 85 C.S.R. § 15.4, sets forth the seven steps which must be followed in the rehabilitation of an injured worker. If a lower numbered step is inappropriate for the injured worker, the regulations state that "the next higher numbered priority must be utilized." The regulation states:

> 4.1. Qualified rehabilitation professionals must utilize the following priorities. No higher numbered priority may be utilized unless the commissioner has determined that all lower numbered priorities are unlikely to result in the placement of the injured worker into suitable gainful employment. If a lower numbered priority is clearly inappropriate for the injured worker, the next higher numbered priority must be utilized. The rehabilitation plan must explicitly state the reasons and rationale for the rejection of any lower numbered priority. The priorities are as follows:
> 4.1.1. Return of the injured worker to the preinjury job with the same employer;

> 4.1.2. Return of the injured worker to the preinjury job with the same employer and with modification of task, work structure or work hours;
> 4.1.3. Return of the injured worker to employment with the same employer in a different position;
> 4.1.4. Return of the injured worker to employment in a different position with the same employer and with on-the-job training;
> 4.1.5. Employment of the injured worker by a new employer and without training;
> 4.1.6. On-the-job training of the injured worker for employment with a new employer; or
> 4.1.7. Enrollment of the injured worker in a retraining program which consists of a goal-oriented period of formal retraining designed to lead to suitable gainful employment in the labor market; provided, that there exists a reasonable expectation of the injured worker actually obtaining such employment upon completion of the program.

The rehabilitation counselor took the position that because the petitioner's job had been terminated, "this counselor is unable to proceed with the first four steps of the rehabilitation hierarchy[.]" As the counselor stated in her report:

I contacted [the petitioner's claims representative at the Division] and informed him, per my conversation with the preinjury employer, the claimant was not eligible to receive continued vocational rehabilitation services since he had been terminated from employment with Simonton Windows on 12/18/98 as a result of the terms and conditions of his contract with Simonton Windows as a seasonal employee.

In other words, because the petitioner was a "seasonal" employee, he could not be returned to his job with Simonton—and therefore could not complete the first four steps of the rehabilitation hierarchy. The rehabilitation counselor appears to have taken the position that because the petitioner could not successfully complete the first four steps, he was ineligible for steps five through seven of the hierarchy.

On May 1, 2000, the Recourse rehabilitation counselor sent the petitioner a letter stating that his vocational rehabilitation file was closed[3] because he was ineligible for rehabilitation services. The petitioner's attorney disputed this declaration by the rehabilitation counselor, and spoke with a supervisor at the Division by telephone. The supervisor agreed with petitioner's attorney that the Recourse rehabilitation counselor was wrong in finding that the petitioner was ineligible for vocational rehabilitation services. The supervisor indicated she would have Recourse carry through with the petitioner's rehabilitation because it was a "preferred employer company," or she would find another provider of rehabilitation services.

The petitioner states in his petition that on June 14, 2000, the Division supervisor spoke by telephone with the rehabilitation counselor at Recourse. The supervisor explained

that the petitioner was, in fact, legally eligible for vocational rehabilitation services, and gave Recourse another opportunity to provide the services. However, the rehabilitation counselor at Recourse did not agree with the Division's assessment, and replied that she would have to speak to Simonton's attorney before she could agree to provide any rehabilitation services to the petitioner. The rehabilitation counselor apparently indicated to the Division supervisor that she would call back once she had received advice from Simonton's attorney.

The rehabilitation counselor at Recourse never responded back to the Division's phone call.

## C.

### Petitioner's Third Attempt at Rehabilitation Services

Accordingly, on June 26, 2000, the Division entered an order referring the petitioner to Vass Vocational Services, a company which was not a preferred provider for rehabilitation services for the employer. Vass Vocational assessed the petitioner's skills and condition, and drafted a rehabilitation plan whereby the petitioner would seek employment with a new employer without training, as provided in step five of the rehabilitation hierarchy. The rehabilitation plan also provided that the petitioner would receive temporary total disability benefits from October 5, 2000 through November 5, 2000, to pay for job-search expenses. This rehabilitation plan was submitted to the Division for approval.

The Division did not act on the petitioner's rehabilitation plan. The petitioner's claims representative failed to respond to repeated phone calls and e-mail messages from Vass Vocational. Because the plan was not approved, the petitioner did not receive any temporary total disability benefits, and had difficulty paying the expenses involved in searching for a job. Vass Vocational there-

---

**3.** To be clear, the record indicates that the petitioner's file was being closed by the provider of rehabilitation services, and not the Division.

fore decided, on December 15, 2000, to close the petitioner's vocational file.[4]

The petitioner's attorney then spoke with the petitioner's claims representative at the Division on December 19, 2000, to determine why the rehabilitation plan was never approved. The claims representative indicated she had never received the plan, and had received no inquiries regarding the status of the plan. She also indicated that she did not usually work with "private rehab." The claims representative indicated that she would review the petitioner's case, and would issue a decision either approving or denying the vocational rehabilitation plan.

By April 2, 2001, the Division had still not approved the rehabilitation plan. Accordingly, the petitioner filed the instant petition seeking a writ of mandamus against the Commissioner of the Workers' Compensation Division, challenging the legality of the Division's rehabilitation system that relies upon "employers' preferred providers of rehabilitation services," and seeking to compel the Division to act on his rehabilitation plan.

## II.

### Standard of Review

As an initial matter, we review the standard for issuing a writ of mandamus. We have held that "[s]ince mandamus is an 'extraordinary' remedy, it should be invoked sparingly." *State ex rel. Billings v. City of Point Pleasant,* 194 W.Va. 301, 303, 460 S.E.2d 436, 438 (1995) (footnote omitted). "The traditional use of mandamus has been to confine an administrative agency or an inferior court to a lawful exercise of its prescribed jurisdiction or 'to compel it to exercise its authority when it is its duty to do so.'" *Id.*

The traditional standard for granting mandamus relief was stated in Syllabus Point 2 of *State ex rel. Kucera v. City of Wheeling,* 153 W.Va. 538, 170 S.E.2d 367 (1969):

> A writ of mandamus will not issue unless three elements coexist—(1) a clear legal right in the petitioner to the relief sought; (2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy.

"Once these prerequisites are met, this Court's decision whether to issue the writ is largely one of discretion." *State ex rel. Billings v. City of Point Pleasant,* 194 W.Va. at 304, 460 S.E.2d at 439 (footnote omitted). With this standard in mind, we now address the merits of Mr. McKenzie's petition.

## III.

### Discussion

Several weeks after the instant case was filed with this Court, on April 25, 2001, the Division entered an order approving the rehabilitation plan drafted by Vass Vocational, and authorized Vass Vocational to continue providing rehabilitation services to the petitioner.[5] The petitioner was awarded temporary total disability benefits as well. The Division and the employer both argue that because the petitioner has received the relief he sought, the petition for a writ of mandamus should be dismissed as moot.

The petitioner, however, contends that the system of "employers' preferred providers for rehabilitation services" that has developed is not authorized in any regulation or statute, and is actually in violation of the Workers' Compensation Act.[6]

---

4. The reason given for closing the file was this: This case manager believes that it is unethical to advise Mr. McKenzie to participate in vocational rehabilitation if the rehabilitation plan will not be authorized by [the] Workers' Compensation Division to reimburse Mr. McKenzie for his time and expenses while attempting to obtain gainful employment with a new employer.

5. Apparently, Simonton has contested this order by filing a protest with the Workers' Compensation Office of Judges.

6. The petitioner also challenged the "pattern of workers' compensation claim managers not issuing protestable orders as required by West Virginia Code § 23–5–1." However, the Division notes in its brief that it has settled this issue with the petitioner, stating the Workers' Compensation Commissioner has

   ... determined, as documented by the proposed Consent Order, that claim managers issue protestable orders in claims where such would be required in accordance with W.Va. Code § 23–5–1 and that the claim managers

In Syllabus Point 1 of *State ex rel. Lilly v. Carter,* 63 W.Va. 684, 60 S.E. 873 (1908), this Court established the general doctrine with regard to mootness by stating:

Moot questions or abstract propositions, the decision of which would avail nothing in the determination of controverted rights of persons or of property, are not properly cognizable by a court.

However, in Syllabus Point 1 of *State ex rel. M.C.H. v. Kinder,* 173 W.Va. 387, 317 S.E.2d 150 (1984), we outlined a well-established exception to the mootness doctrine in cases similar to the present case:

A case is not rendered moot even though a party to the litigation has had a change in status such that he no longer has a legally cognizable interest in the litigation or the issues have lost their adversarial vitality, *if such issues are capable of repetition and yet will evade review.* (Emphasis added.)

In Syllabus Point 1 of *Israel by Israel v. W.Va. Secondary Schools Activities Comm'n,* 182 W.Va. 454, 388 S.E.2d 480 (1989), we established a test for determining whether to address a moot issue:

Three factors to be considered in deciding whether to address technically moot issues are as follows: first, the court will determine whether sufficient collateral consequences will result from determination of the questions presented so as to justify relief; second, while technically moot in the immediate context, questions of great public interest may nevertheless be addressed for the future guidance of the bar and of the public; and third, issues which may be repeatedly presented to the trial court, yet escape review at the appellate level because of their fleeting and determinate nature, may appropriately be decided.

Although the petitioner no longer has a legally cognizable interest in the litigation because he has received the relief he sought, the underlying legal issue, namely the legality of the Division's system of referring workers' compensation claimants to "employers'

preferred providers for rehabilitation services," is of great public interest to workers in this State and is capable of repetition. If this Court simply dismissed this action as moot, future claimants may be adversely affected by this system. Because of the possibility that the Division's continued utilization of this system may escape review at the appellate level, we address the merits of this case under the *Kinder–Israel* exception to the mootness doctrine.

The Workers' Compensation Act provides benefits to workers who have "received personal injuries in the course of and resulting from their covered employment[.]" *W.Va. Code,* 23–4–1 [1989]. The benefits available include rehabilitation services such as "vocational or on-the-job training, counseling, assistance in obtaining appropriate temporary or permanent work site, work duties or work hours modification, ... crutches, artificial limbs, or other approved mechanical appliances, or medicines, medical, surgical, dental or hospital treatment[.]" *W.Va.Code,* 23–4–9(b) [1994].

The Commissioner represents that, to provide rehabilitation services to some claimants, the Division utilizes a "preferred provider" system that permits either of two options. The first option is a system of "managed care providers" of rehabilitation services. The Commissioner's regulations, 85 C.S.R. § 15–13, allow an employer to formally petition the Commissioner to establish its own "managed care" vocational and physical rehabilitation services program for its injured workers. If an employer chooses to use such a "managed care" option, then the employer must undertake the processing and direct payment of all invoices and charges for rehabilitation services provided to injured workers.

The second option for a "preferred provider" system is, simply, an informal method of the Division using a list of "employers' preferred providers for rehabilitation services." Under this second option, employers contract directly with rehabilitation providers to be

should not decline to issue such protestable orders to prevent a matter from being adjudicated.

We accept the representations of the parties that this issue has been addressed.

the employer's preferred provider of rehabilitation services for employees injured on the job. The provider then contacts the Division and is simply added to the list that the Division uses in selecting a rehabilitation services vendor.

The Commissioner concedes that there is no statutory or regulatory authority for the Division's second option. Instead, the Commissioner states in his brief that it began "several years ago" when a vendor of rehabilitation services approached the Commissioner stating that her firm wanted to be the "preferred provider" of rehabilitation services for a Charleston employer. The then-Commissioner "approved this proposal and the concept [for the second option] of an employer preferred provider was born." From this beginning, the Commissioner asserts that the Division has "developed internal procedures" with "necessary requirements" so that the Division may approve a rehabilitation vendor as an employer's preferred provider of rehabilitation services.

The Commissioner states in his brief that under the first option, there are 16 rehabilitation vendors who are participating with 99 employers who have petitioned to establish managed care programs for their workers. Additionally, under the second option, approximately 50 rehabilitation vendors are listed with the Commissioner as "employers' preferred providers" representing 1,532 employers.

We begin our examination of the Commissioner's "preferred provider" system by considering the statutory basis for rehabilitation. Rehabilitation is an integral part of the West Virginia workers' compensation system. As the Workers' Compensation Act states, in *W.Va.Code*, 23–4–9(a) [1999]:

> The Legislature hereby finds that it is a goal of the workers' compensation program to assist workers to return to suitable gainful employment after an injury. In order to encourage workers to return to employment and to encourage and assist employers in providing suitable employment to injured employees, it shall be a priority of the commissioner to achieve early identification of individuals likely to need rehabilitation services and to assess the rehabilitation needs of these injured employees. It shall be the goal of rehabilitation to return injured workers to employment which shall be comparable in work and pay to that which the individual performed prior to the injury. If a return to comparable work is not possible, the goal of rehabilitation shall be to return the individual to alternative suitable employment, using all possible alternatives of job modification, restructuring, reassignment and training, so that the individual will return to productivity with his or her employer or, if necessary, with another employer. The Legislature further finds that it is the shared responsibility of the employer, the employee, the physician and the commissioner to cooperate in the development of a rehabilitation process designed to promote reemployment for the injured employee.

The Legislature has, however, imposed limits upon rehabilitation services. For example, *W.Va.Code*, 23–4–9(b) provides that expenditures "for vocational rehabilitation shall not exceed ten thousand dollars for any one injured employee." To control expenditures, the Commissioner is statutorily authorized to establish a schedule of "maximum reasonable amounts" to be paid to rehabilitation service providers and the Commissioner is empowered to enter into "preferred provider and managed care agreements," that is, agreements between the Division and the rehabilitation provider. *See W.Va.Code*, 23–4–3(a)(1) [1995].[7]

---

7. *W.Va.Code*, 23–4–3(a) states, in pertinent part:
   (a) The workers compensation division shall establish and alter from time to time as the division may determine to be appropriate a schedule of the maximum reasonable amounts to be paid to ... providers of rehabilitation services....
   The division shall disburse and pay from the fund for such personal injuries to such employees as may be entitled thereto hereunder as follows:
   (1) Such sums for ... rehabilitation services ... as may be reasonably required. The division shall determine that which is reasonably required within the meaning of this section .... The division is authorized to enter into preferred provider and managed care agreements.

The Commissioner argues that regulations support the creation of a system of referring claimants, not to the Division's chosen provider of rehabilitation services, but to an employer's chosen provider, in order to reduce expenditures.

The petitioner, however, argues that the entire system of referring claimants to the employer's preferred provider for rehabilitation services has no support in the law.

First, the petitioner contends that the Workers' Compensation Act specifically prohibits an employer from entering into an agreement with a health care provider, and then requiring an employee injured in the course of their employment to seek medical care from that provider. *W.Va.Code,* 23–4–3(b) provides both civil and criminal penalties for doing so, and states in part that:

No employer shall enter into any contracts with any hospital, its physicians, officers, agents or employees to render medical, dental or hospital service or to give medical or surgical attention therein to any employee for injury compensable within the purview of this chapter, and no employer shall permit or require any employee to contribute, directly or indirectly, to any fund for the payment of such medical, surgical, dental or hospital service within such hospital for such compensable injury. Any employer violating this section shall be liable in damages to the employer's employees as provided in section eight, article two of this chapter, and any employer or hospital or agent or employee thereof violating the provisions of this section shall be guilty of a misdemeanor, and, upon conviction thereof, shall be punished by a fine not less than one hundred dollars nor more than one thousand dollars or by imprisonment not exceeding one year, or both . . .

In enacting this statute, the Legislature recognized the inherent conflict that results from an employer's contract to provide medical services to an employee.

■ The respondents, however, argue that rehabilitation services are not "medical, dental or hospital service[s]" under *W.Va.Code,* 23–4–3, and are therefore exempt from the prohibition. However, "[b]y numerous decisions of this Court the workmen's compensation statute of this State must be given a liberal interpretation in order that its beneficent purposes may not be defeated by a strict construction of its terms." *Walk v. State Compensation Comm'r,* 134 W.Va. 223, 228, 58 S.E.2d 791, 794 (1950). In sum, "[t]he Workmen's Compensation Law is remedial in its nature, and must be given a liberal construction to accomplish the purpose intended." Syllabus Point 3, *McVey v. Chesapeake & Potomac Telephone Co.,* 103 W.Va. 519, 138 S.E. 97 (1927). *See also, Martin v. Workers' Compensation Div.,* 210 W.Va. 270, 557 S.E.2d 324 (2001); *Plummer v. Workers' Compensation Div.,* 209 W.Va. 710, 551 S.E.2d 46 (2001); *Zackery v. State Workmen's Compensation Comm'n,* 162 W.Va. 932, 253 S.E.2d 532 (1979); *Johnson v. State Workmen's Compensation Comm'r,* 155 W.Va. 624, 186 S.E.2d 771 (1972); *Burgess v. State Compensation Comm'r,* 121 W.Va. 571, 5 S.E.2d 804 (1939); *Martin v. State Compensation Comm'r,* 111 W.Va. 420, 162 S.E. 486 (1932); *Vandall v. State Compensation Comm'r,* 110 W.Va. 61, 158 S.E. 499 (1931); *Bonner v. State Compensation Comm'r* 110 W.Va. 38, 156 S.E. 847 (1931); *Kincannon v. State Compensation Comm'r,* 107 W.Va. 533, 149 S.E. 665 (1929).

■ The beneficent purpose of *W.Va.Code,* 23–4–3 is to protect a claimant's interest in determining his or her own course of treatment for a compensable injury. Part of that course of treatment would obviously include any physical or vocational rehabilitation, as the term "rehabilitation" is defined to include "medicines, medical, surgical, dental or hospital treatment." *W.Va.Code,* 23–4–9(b). We therefore believe that the prohibition against employers entering "into any contracts with any hospital, its physicians, officers, agents or employees to render medical, dental or hospital service" contained in *W.Va.Code,* 23–4–3(b) includes contracts regarding the rendering of physical or vocational rehabilitation services.

The petitioner also argues that the Act plainly protects a workers' compensation claimant's initial right to choose his or her health care provider for a work-related inju-

ry. Even the Commissioner concedes in his brief that the "weakness in both the preferred provider system and the managed care system is that the claimant needs to have the right to select the initial rehabilitation provider." *W.Va.Code,* 23-4-3(b) states, in part:

> [N]othing in this section shall be deemed to restrict the right of a claimant to select his or her initial health care provider for treatment of a compensable injury or disease.

This statute was enacted by the Legislature to abolish the system of "company doctors," whereby injured workers were required to seek treatment solely from their employer's chosen physician and none other.

The statute does, however, allow employers to maintain a group health insurance plan that involves managed health care arrangements to limit non-work-related medical expenditures. The statute makes clear, however, that if a claimant decides to change health care providers, and the employer maintains a managed care plan, then the claimant—not the employer—must choose a provider within the employer's managed health care plan. The statute, *W.Va.Code,* 23-4-3(b) states, in part:

> Should such a claimant thereafter wish to change his or her health care provider and if his or her employer has established and maintains a managed health care program consisting of a preferred provider organization or program, a health maintenance

organization, then the claimant shall select a new health care provider through such managed care program.

However, if the Division participates in a managed care relationship with a provider, and the claimant's employer does not, then the Division may refer the claimant to a provider of the Division's choosing.[8]

Thirdly, the petitioner argues that the Act requires that the Workers' Compensation Commissioner—and not employers or their agents—develop and direct a claimant's rehabilitation plan. *W.Va.Code,* 23-4-9(b) states, in pertinent part:

> [T]he commissioner shall at the earliest possible time determine whether the employee would be assisted in returning to remunerative employment with the provision of rehabilitation services and if the commissioner determines that the employee can be physically and vocationally rehabilitated ... *the commissioner shall forthwith develop a rehabilitation plan* for the employee and, after due notice to the employer, expend such an amount as may be necessary for the aforesaid purposes[.]

(Emphasis added.) Furthermore, the Act provides that "it is the shared responsibility of the employer, the employee, the physician and the commissioner to cooperate in the development of a rehabilitation process designed to promote reemployment for the injured employee." *W.Va.Code,* 23-4-9(a). However, any rehabilitation process must be

---

**8.** *W.Va.Code,* 23-4-3(b) provides, in pertinent part:

> The foregoing provisions of this subsection shall not be deemed to prohibit an employer from participating in a preferred provider organization or program or a health maintenance organization or managed care organization or other medical cost containment relationship with the providers of medical, hospital or other health care: Provided, however, That nothing in this section shall be deemed to restrict the right of a claimant to select his or her initial health care provider for treatment of a compensable injury or disease. Should such a claimant thereafter wish to change his or her health care provider and if his or her employer has established and maintains a managed health care program consisting of a preferred provider organization or program, a health maintenance organization, then the claimant

> shall select a new health care provider through such managed care program. Moreover, if the division enters into an agreement which has been approved by the compensation programs performance council with a preferred provider organization or program, a health maintenance organization or other health care delivery organization or organizations, then if a claimant seeks to change his or her initial choice of health care provider and if the claimant's employer does not provide access to such an organization as part of the employer's general health insurance benefit, then the claimant shall be provided with a new health care provider from the division's preferred provider organization or program, health maintenance organization or other health care delivery organization or organizations available to him or her.

"pursuant to a rehabilitation plan to be developed and monitored by a rehabilitation professional for each injured employee." *W.Va. Code,* 23-4-9(b).

■ It is a basic rule of statutory construction that "[s]tatutes in pari materia must be construed together and the legislative intention, as gathered from the whole of the enactments, must be given effect." Syllabus Point 3, *State ex rel. Graney v. Sims,* 144 W.Va. 72, 105 S.E.2d 886 (1958). We are also mindful that:

> Given the statutory basis of workers' compensation rights and resultant remedies, the primary method of ascertaining the availability and scope of such benefits is to look to the plain meaning of the applicable statutes and to ascertain the Legislature's intent in enacting the provisions at issue. "The primary object in construing a statute is to ascertain and give effect to the intent of the Legislature." Syl. pt. 1, *Smith v. State Workmen's Compensation Comm'r,* 159 W.Va. 108, 219 S.E.2d 361 (1975).

*State ex rel. ACF Industries, Inc. v. Vieweg,* 204 W.Va. 525, 537, 514 S.E.2d 176, 188 (1999). *In accord, Martin v. Workers' Compensation Div.,* 210 W.Va. 270, 280, 557 S.E.2d 324, 334 (2001).

The petitioner asserts that these statutes, read together, impose responsibility solely upon the Commissioner, and not the employer, to develop and execute a rehabilitation plan for an injured workers' compensation claimant, and prohibit the Commissioner from requiring a claimant to receive rehabilitation services solely from a rehabilitation provider under contract with the claimant's employer.

■ "Where the language of a statute is clear and without ambiguity the plain meaning is to be accepted without resorting to the rules of interpretation." Syllabus Point 2, *State v. Elder,* 152 W.Va. 571, 165 S.E.2d 108 (1968). *In accord,* Syllabus Point 1, *Peyton v. City Council of Lewisburg,* 182 W.Va. 297, 387 S.E.2d 532 (1989); Syllabus Point 2, *Mallamo v. Town of Rivesville,* 197 W.Va. 616, 477 S.E.2d 525 (1996). The statutes cited by the petitioner are couched in terms of a mandatory duty using the word "shall." "It is well established that the word 'shall,' in the absence of language in the statute showing a contrary intent on the part of the Legislature, should be afforded a mandatory connotation." Syllabus Point 1, *Nelson v. West Virginia Public Employees Ins. Bd.,* 171 W.Va. 445, 300 S.E.2d 86 (1982). We believe that the statutes in question are clear and unambiguous, and impose mandatory duties and restrictions upon the parties.

■ We therefore hold that under *W.Va.Code,* 23-4-3(b), an employer is prohibited from entering into any contract with a health care provider for purposes of providing services, including rehabilitation services, to employee-claimants injured in the course of and as a result of their employment. Furthermore, under *W.Va.Code,* 23-4-3(b), a claimant has a right to select his or her initial health care provider or provider of rehabilitation services for the treatment of a compensable injury or disease. If the claimant thereafter wishes to change his or her provider, and if the employer participates in a program to manage health care costs, then the claimant must choose a provider through the employer's managed care program. If the claimant thereafter wishes to change his or her provider, and if the employer does not participate in a managed care program, but the Division does participate in a managed care program, then the Division may choose the claimant's new provider through its managed care program. Simply put, rehabilitation services are to be accorded the same treatment as currently given any other health care or medical services for on-the-job injuries.

■ Additionally, we hold that when the Commissioner determines that a claimant is a candidate for rehabilitation services, *W.Va. Code,* 23-4-9 requires the Commissioner to develop and implement a plan for the claimant's rehabilitation services. The Commissioner must, with the assistance of the claimant's rehabilitation professional develop and monitor the rehabilitation plan, and the employer, the claimant, the claimant's physician and the Commissioner must cooperate in the development of the rehabilitation plan.

The petitioner asserts that, in light of *W.Va.Code,* 23–4–3 and *W.Va.Code,* 23–4–9, the Commissioner's system of using an employer's preferred provider for rehabilitation services is in violation of law. In sum, the petitioner argues that to the extent the Commissioner's regulations, internal policies and procedures conflict with the Act, those regulations and policies are void and unenforceable. We agree.

As a rule of statutory construction, we have repeatedly held that:

> Any rules or regulations drafted by an agency must faithfully reflect the intention of the Legislature, as expressed in the controlling legislation. Where a statute contains clear and unambiguous language, an agency's rules or regulations must give that language the same clear and unambiguous force and effect that the language commands in the statute.

Syllabus Point 4, *Maikotter v. University of W.Va. Bd. of Trustees,* 206 W.Va. 691, 527 S.E.2d 802 (1999). We held similarly in Syllabus Point 3 of *Rowe v. W.Va. Dept. of Corrections,* 170 W.Va. 230, 292 S.E.2d 650 (1982) that:

> It is fundamental law that the Legislature may delegate to an administrative agency the power to make rules and regulations to implement the statute under which the agency functions. In exercising that power, however, an administrative agency may not issue a regulation which is inconsistent with, or which alters or limits its statutory authority.

*See also, Anderson & Anderson Contractors, Inc. v. Latimer,* 162 W.Va. 803, 807–08, 257 S.E.2d 878, 881 (1979) ("Although an agency may have power to promulgate rules and regulations, the rules and regulations must be reasonable and conform to the laws enacted by the Legislature."). In sum, "[a] statute, or an administrative rule, may not, under the guise of 'interpretation,' be modified, revised, amended or rewritten." Syllabus Point 1, *Consumer Advocate Div'n v. Public Service Comm'n,* 182 W.Va. 152, 386 S.E.2d 650 (1989). "The judiciary is the final authority on issues of statutory construction, and we are obliged to reject administrative constructions that are contrary to the clear language of a statute." Syllabus Point 5, *CNG Transmission Corp. v. Craig,* 211 W.Va. 170, 564 S.E.2d 167 (2002).

In the instant case, the statutory provisions are clear. First, an employer's agreement with a provider of rehabilitation services to be the employer's "preferred provider" violates the prohibition against contracts with health care providers contained in *W.Va.Code,* 23–4–3(b). Whether or not such a contract has been "approved" by the Commissioner as a "managed care plan" or as an informal "preferred provider" arrangement, the contract's purpose is to provide medical or rehabilitation services to a claimant for an injury compensable within the purview of the Workers' Compensation Act. Such a contract is prohibited, and the instant case demonstrates the reasons for the Legislature's adoption of the prohibition.

This case shows a pattern of an employer exercising substantial influence over its chosen rehabilitation professional, all with the acquiescence of the Commissioner. When the petitioner was referred by the Division to QRS, the employer's first preferred provider of rehabilitation services, QRS refused to provide services on the ground the petitioner was a "seasonal" employee. QRS determined—at the employer's insistence—that the petitioner was not legally eligible for rehabilitation benefits, in reliance upon reasoning not supported by law. In essence, the employer's preferred rehabilitation provider became an advocate for the employer's position that the petitioner was not eligible for benefits, and not an advocate for the petitioner's return to the workforce.

Similarly, when the petitioner was referred to Recourse, Inc., the employer's second preferred provider, the rehabilitation specialist at Recourse determined that, after consultation with the employer, the petitioner could never be returned to his job with Simonton because he was a "seasonal" employee—and therefore determined that the petitioner could not complete the first four steps of the rehabilitation hierarchy. This determination is contrary to the Commissioner's regulations, which require that if a lower step in

the rehabilitation hierarchy "is clearly inappropriate for the injured worker, the next higher priority must be utilized." When a supervisor at the Division told the Recourse rehabilitation counselor that her interpretation was legally incorrect, the rehabilitation counselor refused to provide services without first consulting to seek the approval of—the employer's attorney. Again, the employer's preferred provider of rehabilitation services became an advocate for the employer, and not the needs of the petitioner.

In *Skaggs v. Eastern Associated Coal,* 212 W.Va. 248, 569 S.E.2d 769 (2002), we considered an egregious fact pattern that demonstrates the purpose for the statute. The plaintiff, who received an on-the-job injury, was released to return to work by two doctors. Instead, the defendant employer (and apparently without the involvement of the Commissioner) determined that the plaintiff should be referred to vocational rehabilitation.

Without examining the plaintiff, the defendant determined that the plaintiff's rehabilitation was to begin at step five, whereby the plaintiff would be assisted in getting employment with a new employer and without training. An agent of the defendant testified that injured workers were never referred to vocational rehabilitation unless it was initially determined that the worker could not be returned to work with the employer. The agent stated that it was a standard, unwritten policy, and that upwards of 50 former employees of the defendant had been referred to rehabilitation, all starting at step five.[9]

The plaintiff in *Skaggs,* believing he would receive some rehabilitation services, met with the employer's preferred provider for rehabilitation services. At the meeting, he signed a document listing the rehabilitation hierarchy indicating he was accepting rehabilitation voluntarily and that his rehabilitation would begin at step five. Several weeks later, the plaintiff was fired from his job because the employer stated that the plaintiff had, by signing the document, voluntarily indicated he was unable to ever return to his job.

We held in *Skaggs* that the plaintiff had established a *prima facie* case of discrimination under the Workers' Compensation Act, finding that the employer's alleged use of the workers' compensation rehabilitation system as a means of removing employees from its payroll raised questions of fact regarding whether the plaintiff was discriminated against as a result of filing a workers' compensation claim.

The Commissioner's requirement that a claimant receive services from the employer's preferred provider of rehabilitation services also violates *W.Va.Code,* 23–4–3(b), which preserves a workers' compensation claimant's right to choose the initial provider of services. The Commissioner, as previously indicated, admits that there is a "weakness" in the system regarding the claimant's right to select his or her initial provider of rehabilitation services. Under *W.Va.Code,* 23–4–3, an employer may certainly participate in a managed care plan such as a health maintenance

---

9. An affidavit submitted into the record by an attorney, James M. Robinson, who has "represented thousands of claimants" in over 22 years of practice, contains a similar statement of problems with the use of an employer's preferred provider for rehabilitation services. Mr. Robinson states:

11. That there are rehabilitation providers that hire employees to provide services to claimants that have no training or education that qualify them to work in the rehabilitation field (e.g. Affiant has taken the testimony of individuals employed by a rehabilitation provider who had a degree in marketing with no training or classes in rehabilitation that testified he got his job as a rehabilitation specialist with the [provider] by answering an ad in a Pennsylvania newspaper);

12. That your Affiant has now and has had several cases where preferred rehabilitation providers were assigned to provide rehabilitation services and in none of these cases has a preferred rehabilitation provider recommended rehabilitation beyond step five in the hierarchy of services nor has any ever stated that a claimant is so impaired as to not benefit from rehabilitation;

13. That your Affiant ... checked with [three other claimant's attorneys] ... and each of these Workers' Compensation Practitioners could relate no incident of a preferred rehabilitation provider going beyond step 5 or ever stating a claimant was so impaired as to render he/she totally disabled[.]

organization (HMO) or preferred provider organization (PPO). However, the statute preserves an injured workers' right to initially select his or provider of a particular service.[10]

Lastly, the system of using preferred providers of rehabilitation services violates the mandate of *W.Va.Code*, 23–4–9 that the Commissioner develop and implement a plan for a claimant's rehabilitation. For example, contrary to this statute, 85 C.S.R. § 15–13.5 states that an "employer need not obtain the prior approval of the Commissioner on any issue pertinent to an injured worker's rehabilitation services." Under the regulation, the employer has complete control over a claimant's rehabilitation,[11] even though the statute clearly indicates a contrary intent by the Legislature. As such the regulation does not conform to the laws enacted by the Legislature and is void and unenforceable.

The regulation is also contradicted by other regulations enacted by the Commissioner, namely the regulations pertaining to the rehabilitation hierarchy. Those regulations, which are found at 85 C.S.R. § 15–4, require "qualified rehabilitation professionals" to utilize seven priorities in the rehabilitation of a claimant. However, the regulations specifically state:

No higher numbered priority may be utilized unless *the commissioner* has determined that all lower numbered priorities are unlikely to result in the placement of the injured worker into suitable gainful employment.

85 C.S.R. § 15–4.1 (emphasis added). In other words, the Commissioner's own regulations place the responsibility for classifying a claimant's condition in the rehabilitation hierarchy in the Commissioner; yet 85 C.S.R. § 15–13.5 contradicts this regulation and gives full responsibility to the employer. We think only the former regulation is supported by the Act, while the latter is not.

■ We therefore hold that the Commissioner's regulations, policies and procedures regarding referral of claimants to an "employer's preferred provider for rehabilitation services" are contrary to the clear language of the Workers' Compensation Act, and therefore void and unenforceable. Contracts by employers with their "preferred providers for rehabilitation services" to provide services to employees injured on the job violate *W.Va.Code*, 23–4–3(b), and the Commissioner's or employer's initial referral of claimants to those "preferred providers" violates a claimant's right to choose his or her initial rehabilitation service provider, as stated in *W.Va.Code*, 23–4–3(b). Furthermore, the

10. We note that employees of employers utilizing HMOs or PPOs are given an opportunity to choose from a list of physicians participating with the HMO or PPO—preserving the employee's choice of health care provider. Under the Commissioner's system of employers' preferred providers for rehabilitation services, the employee has no right whatsoever to choose his or her rehabilitation provider.

11. The briefs of the petitioner and *amici curiae* suggest that this system, giving the employer control over the claimant's rehabilitation, eventually gives the employer substantial power to determine the outcome of a claim, and to indirectly deny a severely injured claimant any ability to receive permanent disability benefits.

The rehabilitation regulations, 85 C.S.R. § 15–2.2.1, contain the following requirement that a claimant "cooperate" with a rehabilitation provider's rehabilitation plan:

An injured worker's refusal to cooperate with the rehabilitation assessment process or to participate in an authorized rehabilitation plan without a showing of good cause is a

factor(s) for the commissioner to consider in determining the amount of any permanent partial disability or permanent total disability award to which the injured worker might otherwise be entitled.

The briefs suggest that employers' preferred rehabilitation providers often impose difficult rehabilitation goals, and then terminate rehabilitation when the claimant "fails to cooperate" by not completing the required goals.

One actual example given by the parties is a claimant, at step five of the rehabilitation hierarchy, who was required to apply for 30 jobs in a two week period. The claimant became ill, and only applied for 28 jobs. The employer's rehabilitation specialist terminated the claimant's vocational rehabilitation program because of the claimant's "non-cooperation" with the program. Under the Commissioner's regulations, the claimant's "refusal to cooperate" could have resulted in a reduction in any permanent disability award she might have received. However, the petitioner asserts that "through extremely vigorous advocacy by her lawyer," the woman was allowed to continue in the vocational rehabilitation program.

Commissioner's regulations and policies abdicate the Commissioner's duty to develop and implement a rehabilitation plan for eligible claimants to the employer's preferred provider of rehabilitation services.

The Commissioner has a clear legal duty to develop and implement rehabilitation plans for eligible claimants, in cooperation with the employer, the claimant, and the claimant's physician, and with the assistance and monitoring of the claimant by a rehabilitation professional. The petitioner, and claimants similarly situated, have a right to initially choose their provider of rehabilitation services, free from the constraints of any contracts by employers for those services. The petitioner's right to relief from the existing regulations and policies of the Commissioner is clear, and we discern no other remedy other than granting the requested relief.

IV.

*Conclusion*

The writ of mandamus is granted as moulded.

Writ Granted as Moulded.

MAYNARD, Justice, dissenting.

(Filed July 9, 2002)

The Pilgrim's Pride Corporation is the second largest poultry producer in the United States. In addition to West Virginia, it has operations in Texas, Arkansas, Arizona, North Carolina, Pennsylvania, Oklahoma, and Virginia. Its products are sold under the Pilgrim's Pride and Wampler Foods labels to food service, retail and frozen entree customers. Its net sales for fiscal 2001 were 2.2 billion dollars. As the largest employer in Hardy County, West Virginia, Pilgrim's Pride has more than 1,600 employees. It annually transports more than 47,000 tractor-trailer loads of feed, live birds and finished products in and out of Moorefield, and its

payroll and grower payments in West Virginia exceed 72 million dollars per year.

I am thankful that Pilgrim's Pride chose to do business in West Virginia. It is obvious from the numbers above that its contribution to the State's economy is substantial. While I am grateful this company chose to do business in our state and employ 1,600 of our wonderful workers, I am a little surprised. Why? Consider this. Of the eight states in which Pilgrim's Pride has an operation, its West Virginia workers' compensation rates are by far the highest. In fact, its West Virginia rates exceed those paid by Pilgrim's Pride in the seven other states combined in which it does business! Look at the numbers. Total workers' compensation premiums paid by Pilgrim's Pride in 2001 equaled $3,895,539. Of this amount, $2,468,201 were paid in West Virginia. This is astonishing considering that only 7% of the company's employees work here. In other words, Pilgrim's Pride paid 63% of its total workers' compensation premiums on behalf of 7% of its workforce. In comparison, in the seven other states in which it does business, it paid a total of $1,407,583 in workers' compensation premiums including only $22,848 in Arkansas and $228,930 in Texas.[1] In round figures, Pilgrim's Pride's total compensation bill nationwide is 3.9 million dollars, and 2.5 million of that is paid in West Virginia alone.

There are businesses which by their very nature must operate in West Virginia. These include extractive industries such as coal, gas, and timber. But if you operate a business, such as Pilgrim's Pride, which can locate anywhere in the United States, considering the numbers set forth above, would you locate in West Virginia? While there are many good reasons for businesses to locate here, including high-quality workers, an efficient transportation system, and cooperation from local and state officials,[2] the state's onerous workers' compensation rates are sig-

1. This information is from a report, dated 11/11/01, which was presented to a committee of the West Virginia Legislature by an officer of the Pilgrim's Pride Corporation.

2. In its 11/11/01 report, Pilgrim's Pride listed as positive things about West Virginia: its excellent

quality of employees; the fact that West Virginia is an optimal area to raise chickens; Corridor H, which is an extremely important means of transportation; and excellent cooperation from local officials.

nificant factors any business would naturally consider before choosing to locate here.

The example of Pilgrim's Pride underscores a serious problem with the West Virginia workers' compensation system. I am convinced that the majority opinions in *McKenzie* and *Repass*, which have the effect of further liberalizing workers' compensation law, only add to the problem. I am joining Justice Davis's dissents in these two cases because I agree wholeheartedly with her analysis of the applicable law. I write separately to discuss what I fear will be the very adverse impact that the majority opinions will have on economic development in this state.

The present workers' compensation system is in very deep trouble. Nobody really knows the exact amount of the system's unfunded liability. Estimates range anywhere from 1.8 billion dollars to more than two billion dollars. My own rough guess is that the unfunded liability may be greater than three billion dollars. While everyone agrees that the workers' compensation system is in dire need of a substantial infusion of cash, there is significant disagreement as to the causes of the problem which are, no doubt, many and complex. Some say that the Workers' Compensation Division pays out too much money in frivolous claims. Others say that the system is under funded or that employers are not paying their fair share of premiums. The Charleston Daily Mail recently ran an editorial titled "The Big Debt" concerning the workers' compensation system's fiscal crises. Because I cannot say it any better, I reproduce that editorial here in its entirety.[3]

The concept is simple: A worker injured on the job deserves aid from his employer. In 1913, the Legislature set up the Workman's Compensation Fund as a means of aiding injured workers without lengthy, costly litigation.

Over the years, more than the name has changed. Lawyers took over the program. They transformed it into a series of asterisks that slow economic development.

That injures all workers by limiting their opportunities for employment within West Virginia.

Few companies want to invest here because:

● Workers' Comp is run by the state, not private enterprise.

● Cases are appealed directly to the state Supreme Court. Half the workload of the high court is settling what should be administrative tasks.

● The unfunded liability is a debt new employers don't want to share, thus slowing economic development to a crawl.

● Some of the 185 self-insured companies could fold, dumping their Workers' Comp responsibilities onto other employers.

● Rulings by the state Supreme Court have liberalized benefit payments beyond the original intent, thus driving up the costs.

● Some companies beat the system and do not pay the premiums they should.

● Health-care costs have mushroomed.

● Too many old claims were never funded properly, i.e., in full.

In light of this, the state's economic development efforts are like putting a fresh coat of paint on an Edsel and pretending it is new.

This will not work. The state needs to face up to its unfunded liability once and for all.

But as State Senate President Earl Ray Tomblin said: "Nobody really knows how much debt we have out there."

Until the state knows how much it owes, the problem remains. And as long as the problem remains, workers' comp is an albatross on the ship of state.

I would like to discuss briefly this Court's role in liberalizing benefit payments "beyond the original intent" which is exemplified in *McKenzie* and *Repass*. As I have said before, this Court regularly conducts a *de novo* review of workers' compensation appeals,

---

**3.** Editorial, *The Big Debt: The State Needs A Handle On Its Workers' Comp Fund,* The Charleston Daily Mail, June 24, 2002, at 4A.

which have already been adjudicated before the Division, Office of Judges, and Workers' Compensation Appeals Board, and regularly reverses these bodies in favor of claimants. One way the Court does this is an overuse of the rule of liberality in contravention of plain statutory provisions. One example will suffice. W.Va.Code § 23–4–6a (1995) expressly provides that the decision of the occupational pneumoconiosis board made following a hearing shall be affirmed "unless the decision is clearly wrong in view of the reliable, probative and substantial evidence on the whole record." This Court, as a standard practice, abrogates this Legislative mandate, applies the liberality rule, disregards the findings of the occupational pneumoconiosis board, and grants the claimant a higher occupational pneumoconiosis award than can be justified by the evidence.

In the two instant cases, the Court once again skews workers' compensation law to favor claimants, contrary to clear Legislative intent. Specifically, disability awards and payments will now be higher thanks to the newly-mandated Range of Model method to evaluate injuries to the spine, and the fact that claimants now have a right to select their initial health care provider of rehabilitation services with no input by the employer. The undeniable result will be larger payments made by the Workers' Compensation Division at the expense of companies like Pilgrim's Pride. This, in turn, makes West Virginia less desirable than many other states in which to locate a business.

Over the past several years, the Legislature has taken steps to place the workers' compensation system back on solid financial footing. This Court, by issuing opinions like *McKenzie* and *Repass,* has done the opposite. In the midst of this hot, dry summer, one easily imagines the Legislature furiously fighting to subdue the wildfires of workers' compensation unfunded liability while, at the

same time, a majority of this Court pours gasoline on the fire.

Accordingly, I dissent.

DAVIS, C.J., dissenting.

(Filed July 17, 2002)

"The right to dissent is the only thing that makes life tolerable for a judge of an appellate court."[1] As is evident from the numerous separate opinions I have authored this term, I find ever more frequently the need to exercise my right to dissent, and to urge my brethren to refrain from torturing the law of this state, and/or usurping the role of the legislature, to achieve their desired result *du jour.* And so, once again, I must disagree with the decision of the majority.

This case was brought as a simple request by Michael McKenzie for a writ of mandamus to compel the Commissioner of the Workers' Compensation Division (hereinafter "the Commissioner") to provide him with vocational rehabilitation services. Although the requested services were granted to Mr. McKenzie during the pendency of this appeal, the majority declined to dismiss the case as moot. Instead, the majority ruled that only a claimant, as opposed to the Commissioner, may select his or her vocational rehabilitation service providers. To reach this holding, the majority confuses physical and vocational rehabilitation, misuses the extraordinary remedy of mandamus, and extends the rule of liberality beyond any bounds anticipated by the legislature or our predecessors on this Court. Consequently, for the reasons set out below, I dissent.[2]

### A. Rehabilitation Services: Vocational versus Physical

There are two types of rehabilitation referred to in the workers' compensation statutes, vocational and physical. One of the most glaring problems with the majority opinion is its failure to distinguish between these two types of services. It is crucial that

---

1. William O. Douglas, *America Challenged* 4 (1960).

2. I note that I do not condone the type of conduct allegedly engaged in by the employer in this case. Had the Commissioner not ultimately

granted Mr. McKenzie the rehabilitation services he sought, Mr. McKenzie could have pursued a remedy in this court via an appeal. *See, e.g., Skaggs v. Eastern Assoc. Coal Corp.,* 212 W. Va. 248, 569 S.E.2d 769 (2002) (Davis, C.J., concurring, with Maynard, J., joining).

this distinction be made as these two types of rehabilitation are very different,[3] and are not necessarily subject to the same statutory provisions.[4] Pursuant to W. Va.Code § 23–4–9(b) (1999) (Supp.2001), *physical* rehabilitation services refer to "the provision of crutches, artificial limbs, or other approved mechanical appliances, or medicines, medical, surgical, dental or hospital treatment[,]"[5] while *vocational* rehabilitation services include "vocational or on-the-job training, counseling, assistance in obtaining appropriate temporary or permanent work site, work duties or work hours modification[.]"[6] Clearly, then, *physical* rehabilitation is associated with the medical aspects of a claimant's recovery from a compensable injury, and *vocational* rehabilitation pertains to providing a claimant with job training and/or necessary accommodations to enable him or her to return to the workforce. *See Bender v. Deflon Anderson Corp.*, 298 A.2d 346, 348 (Del.Super.Ct.1972) ("In the framework of workmen's compensation, rehabilitation is generally considered to be of two types: physical and vocational. The former is simply an extension of medical treatment and undoubtedly would fall within the purview of existing statutes dealing with the employer's obligation to provide medical services and the employee's duty to accept them. 2 Larson Workmen's Compensation Law, § 61.20, p. 88.262. The second aspect of rehabilitation, *i.e.* vocational, does not strictly speaking, involve the supplying of medical services but is, instead, a means for retraining an injured employee in an effort to direct his limited physical capability into other useful channels of productivity.").

In its rush to legislate, the majority has made these two terms synonymous.[7] This commingling of "apples and oranges" was purposefully done to obscure the complete absence of authority supporting the majority's holdings in this case.[8] While the majority correctly notes that W. Va.Code § 23–4–3(b) (1995) (Repl.Vol.1998) grants a claimant the right "to select his or her initial *health care provider* for treatment of a compensable injury or disease" (emphasis added), it proceeds to then misapply this provision to conclude that it grants a claimant the exclusive right to select a vocational rehabilitation service provider. It is plainly evident that a vocational rehabilitation service provider, under its statutory definition as well as common nomenclature, is *not* a health care provider. Vocational rehabilitation services are limited to "vocational or on-the-job training, counseling, assistance in obtaining appropriate temporary or permanent work site, work duties or work hours modification[.]" W. Va.Code § 23–4–9(b). Nothing in this description refers to health care, thus there is absolutely no statutory support for granting a claimant the right to select a vocational counselor under the guise of selecting an initial health care provider under W. Va.Code § 23–4–3(b). In fact, the regulations expressly prohibit such an interpretation. *See* 7A C.S.R. § 85–15–3.11.2 (stating "the term [vocational rehabilitation services provider] does not include licensed physicians, licensed psychologists or hospitals where the services being provided to an injured employee fall under the provisions of W. Va.Code § 23–4–3, and are outside the scope of the pertinent rehabilitation plan.").

W.Va.Code § 23–4–3(b) is plain in permitting claimants to select their initial "health care provider." Consequently, it was unnecessary and improper for the majority to interpret the statute. It is black letter law

---

3. While, in some respects the two terms are commingled in the regulations, the regulations nevertheless are clear that a vocational rehabilitation service provider is not the equivalent of a health care provider. *See infra* text at pages 4 and 5.

4. The claimant in this case was seeking vocational rehabilitation services, not physical rehabilitation services.

5. *See also* 7A C.S.R. § 85–15–3.7 (1994) (defining physical rehabilitation services).

6. *See also* 7A C.S.R. § 85–15–3.10 (1994) (defining vocational rehabilitation services).

7. My dissent focuses solely upon the issue of *vocational* rehabilitation services, as that is the type of rehabilitation identified in Mr. McKenzie's appeal.

8. *But see supra* note 3.

that " '[w]hen a statute is clear and unambiguous and legislative intent is plain the statute should not be interpreted by the courts, and in such case it is the duty of the courts not to construe but to apply the statute.' " *Hall v. Board of Educ. of County of Mingo,* 208 W.Va. 534, 539, 541 S.E.2d 624, 629 (2000) (quoting Syl. pt. 1, *Cummins v. State Workmen's Comp. Comm'r,* 152 W.Va. 781, 166 S.E.2d 562 (1969)). Moreover, "[i]t is also the 'duty of this Court to avoid whenever possible a construction of a statute which leads to absurd, inconsistent, unjust or unreasonable results.' " *Hall,* 208 W.Va. at 539, 541 S.E.2d at 629 (quoting *State v. Kerns,* 183 W.Va. 130, 135, 394 S.E.2d 532, 537 (1990)). In the instant proceeding, the majority has embraced an "absurd" reading of W. Va.Code § 23–4–3(b).

### B. *Writ of Mandamus*

The majority accurately points out that W. Va.Code § 23–4–3(b) also directs that no employer is permitted to "enter into any contracts with any hospital, its physicians, officers, agents or employees to render medical, dental or hospital service or to give medical or surgical attention therein to any employee[.]" However, the majority is absolutely wrong in finding that this prohibition prevents the Commissioner from using a list of employer preferred vocational rehabilitation service providers. As noted above, nothing contained in W. Va.Code § 23–4–3(b) pertains to *vocational* rehabilitation services. Therefore, this statute does not provide a proper basis for ruling that employers may not submit a list of preferred vocational rehabilitation service providers to the Commissioner.

Neither the majority opinion nor my own independent research has uncovered any statute in the workers' compensation laws expressly prohibiting the Commissioner from using a list of employer preferred vocational rehabilitation providers. However, W. Va. Code § 23–4–9(e) provides that "[t]he commissioner shall promulgate rules for the purpose of developing a comprehensive rehabilitation program which will assist injured workers to return to suitable gainful employment[.]" Under the authority of this provision, the Commissioner is granted discretion

to implement a method for providing vocational rehabilitation services to claimants. The Commissioner has exercised this discretion by developing the aforementioned list.

Because the actions of the Commissioner were discretionary, it was improper for the majority to grant the writ of mandamus to impose its own judgment over that of the Commissioner. This Court has "characterized the purpose of the writ [of mandamus] as the enforcement of an established right and the enforcement of a corresponding imperative duty created or imposed by law." Syl. pt. 1, *State ex rel. Ball v. Cummings,* 208 W.Va. 393, 398, 540 S.E.2d 917, 922 (1999) (citing *State ex rel. Bronaugh v. City of Parkersburg,* 148 W.Va. 568, 136 S.E.2d 783 (1964)). It has been explained further that "[m]andamus is a proper remedy to require the performance of a *nondiscretionary* duty by various governmental agencies or bodies." Syl. pt. 1, *State ex rel. Allstate Ins. Co. v. Union Pub. Serv. Dist.,* 151 W.Va. 207, 151 S.E.2d 102 (1966) (emphasis added). While it is true that "[m]andamus lies to control the action of … administrative officer[s] in the exercise of [their] discretion when such action is arbitrary or capricious[,]" Syllabus, *Beverly Grill, Inc. v. Crow,* 133 W.Va. 214, 57 S.E.2d 244 (1949), " '*it is never employed to prescribe in what manner they shall act, or to correct errors they have made.'* " *State ex rel. State v. Gustke,* 205 W.Va. 72, 76 n. 2, 516 S.E.2d 283, 287 n. 2 (1999) (quoting Syl. pt. 8, *Nobles v. Duncil,* 202 W.Va. 523, 505 S.E.2d 442 (1998) (additional citation omitted)). *Accord* Syl. pt. 4, *Paxton v. State Dep't of Tax and Revenue,* 192 W.Va. 213, 451 S.E.2d 779 (1994); Syl. pt. 3, *Anderson v. Richardson,* 191 W.Va. 488, 446 S.E.2d 710 (1994); Syl. pt. 6, *Lyons v. Richardson,* 189 W.Va. 157, 429 S.E.2d 44 (1993); *Francis O. Day Co., Inc. v. West Virginia Reclamation Bd. of Review,* 188 W.Va. 418, 422, 424 S.E.2d 763, 767 (1992); Syl. pt. 2,*State ex rel. Lambert v. Cortellessi,* 182 W.Va. 142, 386 S.E.2d 640 (1989); Syl. pt. 3, *State ex rel. Canterbury v. County Court of Wayne County,* 151 W.Va. 1013, 158 S.E.2d 151 (1967); *Meador v. County Court of McDowell County,* 141 W.Va. 96, 112, 87 S.E.2d 725, 736 (1955); Syl. pt. 1, *State ex rel. Buxton v. O'Brien,* 97 W.Va. 343, 125

S.E. 154 (1924). The majority's holding in this case merely corrected a perceived error committed by the Commissioner in exercising his discretionary authority. In the absence of a finding that the Commissioner's actions were arbitrary or capricious, it was simply wrong to use the extraordinary remedy of mandamus in this manner.

The ultimate result of the majority decision in this case is to overrule a long line of precedent prohibiting the use of a writ of mandamus to dictate the manner in which a government agency should exercise its discretionary authority. The majority has mandated the precise manner in which the Commissioner may exercise his discretion to develop a method for selecting vocational rehabilitation service providers, by permitting only claimants to make the selection. The majority's decision has made the writ of mandamus a tool to be used by the Court to control any and every government action it desires. This new extension of the writ of mandamus has no constitutional basis, and is a real and dangerous threat to the separation of powers doctrine embodied in this state's constitution. *See State ex rel. League of Women Voters of West Virginia v. Tomblin*, 209 W.Va. 565, 579, 550 S.E.2d 355, 369 (2001) (Davis, J., dissenting) ("Integral to the separation of powers is the notion that each of the branches of government has its own constituent components and its own defined functions.").

### C. Rule of Liberality

Finally, and most troubling, is the majority's reliance on the rule of liberality as justification to rewrite statutes in this case. In this and other workers' compensation cases recently decided by this Court,[9] a majority of its members have demonstrated a disturbing trend of touting the liberality rule to rationalize overstepping this Court's authority in order to achieve desired goals. *See, e.g., Martin v. Workers' Comp. Div.*, 210 W.Va. 270, 285, 557 S.E.2d 324, 339 (2001) (Maynard, J., dissenting) (observing that this Court "routinely cites the liberality rule and uses it to justify its decisions in workers'

compensation appeals."). Contrary to this unabashed exploitation, the rule of liberality has historically been used in workers' compensation cases in a manner that did not sacrifice basic legal principles and trample upon the authority of the legislative and executive branches of government.

In my dissenting opinion in *Repass v. Workers' Comp. Div.*, 212 W. Va. 86, 569 S.E.2d 162 (2002) (Maynard, J., joining), I explain in detail that the rule of liberality, which must be mollified by reasonableness, should never be used as an excuse to interpret statutory language that is plain, or to engage in improper judicial legislating. *See also Ford v. Mitcham*, 53 Ala.App. 102, 104, 298 So.2d 34, 36 (1974) ("liberality of construction should not proceed to such a point as to amount to judicial legislation."); *Deese v. Southeastern Lawn & Tree Expert Co.*, 306 N.C. 275, 277, 293 S.E.2d 140, 143 (1982) ("liberality should not ... extend beyond the clearly expressed language of th[e] [statutes], and our courts may not enlarge the ordinary meaning of the terms used by the legislature or engage in any method of judicial legislation.... [C]onsequently, the judiciary should avoid ingrafting upon a law something that has been omitted, which [it] believes ought to have been embraced." (citations and internal quotation marks omitted)); *In re Corman*, 909 P.2d 966, 971 (Wyo.1996) ("[C]ourts are not free under the guise of liberal construction to extend worker's compensation benefits ... that do not *reasonably* fall within the statute." (citation omitted) (emphasis added)).

In the case *sub judice*, the majority has employed the rule of liberality to judicially create legislative requirements that cannot reasonably be gleaned from existing statutes. Such action is simply wrong. As one court put it, the rule of liberality "does not imply that liberality is boundless or that common sense is disregarded." *Christian Civic Action Comm. v. McCuen*, 318 Ark. 241, 246, 884 S.W.2d 605, 608 (1994). The type of brazen and illogical crusading engaged in by the majority in this case was appropriately

9. *See, e.g., Repass v. Workers' Comp. Div.*, 212 W. Va. 86, 569 S.E.2d 162 (2002), and *Skaggs v. Eastern Assoc. Coal Corp.*, 212 W. Va. 248, 569 S.E.2d 769 (2002).

denounced in the dissenting opinion of *Quinn v. State*, 15 Cal.3d 162, 180, 124 Cal.Rptr. 1, 13, 539 P.2d 761, 773 (1975) (Clark, J., dissenting):

> [T]he statutory rule of liberal construction, relied on by the majority, does not invest this court with power to administer workers' compensation as we see fit. . . . "[H]ow far . . . 'liberality' may extend would seem to depend upon two considerations: (1) the latitude permitted by the wording of the statute which is to be construed; and (2) the latitude permitted, within such limitations, by the views of the reviewing tribunal. The first is a limitation of an objective character; the second is a subjective or personal limitation. When the latter ignores the former, [a] question may well arise as to where liberal interpretation ends and nullification begins." . . . We must eschew the temptation to become crusaders.

(Internal citations omitted). Without some modicum of restraint by the majority, our worker's compensation system may soon succumb to irreparable damage.

### D. The End of the Road for the West Virginia Workers' Compensation System

The decision of the majority in this case represents a form of unbridled judicial activism that is an insult to the principles of statutory construction developed by this Court to maintain the integrity of the independent branches of state government. Indeed, this case represents yet another example of the determination of the majority to use the rule of liberality to undermine any statute or executive regulation designed to promote the fiscal health of our workers' compensation system. In this regard, I agree with the dissent in *Stephen L.H. v. Sherry L.H.*, espousing that "[j]udicial activism is one thing; stupid judicial activism quite another." 195 W.Va. 384, 398 n. 2, 465 S.E.2d 841, 855 n. 2 (1995) (Neely, C.J., dissenting).

I am at a loss as to what it will take for the majority to realize that there is a future generation of workers who will need the services of a healthy and viable workers' compensation system. The decision in this case is simply another step by the majority in a journey leading ultimately to a workers' compensation system so afflicted by unreasonable laws that it will become utterly incapable of providing legitimate claimants with the benefits and services they so desperately need.

In view of the foregoing, I dissent. I am authorized to state that Justice Maynard joins me in this dissenting opinion.