569 S.E.2d 769

**Shelby D. SKAGGS, Plaintiff Below, Appellant**

v.

**EASTERN ASSOCIATED COAL CORP., Defendant Below, Appellee.**

No. 30190.

Supreme Court of Appeals of West Virginia.

Submitted: May 1, 2002.

Decided: June 28, 2002.

Concurring Opinion of Chief Justice Davis July 17, 2002.

Roger D. Forman, Michael R. Crane, Forman & Crane, L.C., Charleston, for Appellant.

Steven P. McGowan, Ancil G. Ramey, Hannah B. Curry, Steptoe & Johnson, P.L.L.C., Charleston, for Appellee.

STARCHER, Justice:

In this appeal from the Circuit Court of Boone County, we are asked to examine an order granting summary judgment against a plaintiff-employee who alleges he was terminated from his job, and thereby discriminated against by his defendant-employer, for receiving workers' compensation benefits. The defendant alleges that the plaintiff voluntarily accepted workers' compensation rehabilitation services, and in doing so voluntarily indicated he was unable to ever return to his job—hence, his job was terminated. The plaintiff, however, alleges that the defendant is employing a complicated scheme to use the workers' compensation rehabilitation system as a way of removing employees injured on the job from its payroll.

As set forth below, after carefully examining the record we find genuine issues of material fact remain for consideration by the finder of fact. We reverse the circuit court's summary judgment order and remand the case for further proceedings.

## I.

### Facts & Background

Plaintiff-appellant Shelby D. Skaggs was employed as a motor man for defendant-appellee Eastern Associated Coal Corporation and was injured during the course of and as a result of his employment on October 2, 1997. The plaintiff filed a claim for workers' compensation benefits with the West Virginia Workers' Compensation Division, and received temporary total disability benefits during his recovery.

The defendant apparently had a policy mandating that injured workers submit to a functional capacity evaluation before being allowed to return to work. In a letter written to the plaintiff's doctor on October 20, 1997, 18 days after the plaintiff's injury, a workers' compensation claims administrator working on the defendant's behalf stated:

> Eastern Associated Coal Corporation is participating in a Rehabilitation Program approved by the Workers' Compensation Division. As part of this program, Eastern Associated Coal Corporation employees are required to complete a Functional Capacity Evaluation . . . .

> Please do not return claimant to work prior to the initial functional capacity evaluation as their employer cannot accept them without this evaluation being completed.

In accordance with this company policy, on April 6, 1998, apparently before the plaintiff's injuries had fully healed, the plaintiff was required by the defendant to submit to a "functional capacity evaluation." The report generated by the evaluator stated that the plaintiff could engage in light work, but that the plaintiff "is currently unable to return to his former position as a Motorman[.]"

Several months later, the plaintiff was evaluated by two different doctors-Dr. Paul Bachwitt in August 1998 and Dr. John Kroening in December 1998. Both doctors concluded that the plaintiff had fully recovered and reached his maximum degree of

medical improvement. Based upon these evaluations, the Workers' Compensation Division suspended the plaintiff's temporary total disability benefits on December 29, 1998, and the plaintiff was awarded a 4% permanent partial disability award.

Dr. Bachwitt's report indicated that the plaintiff "could return any time" to his customary duties with the defendant and "should either be returned to work or put into a work hardening program." Dr. Bachwitt also indicated that he felt the claimant was a candidate for vocational rehabilitation because "I feel all individuals are vocational rehabilitation candidates." Dr. Kroening similarly reported that the plaintiff did not need "restrictions, accommodations or restrictive devices . . . to carry out usual activities or meet . . . appropriate occupational demands," but did state that "[i]t would be reasonable to avoid hyperextension of the neck."

The defendant's workers' compensation claims were managed by a third-party administrator called Acordia. On May 13, 1999, a "senior compensation specialist" at Acordia, acting on behalf of the defendant, wrote a letter to the plaintiff. The letter stated that, based upon the functional capacity evaluation and the two doctors' reports,

the plaintiff was being referred to Genex Services, Inc., a company that "provides vocational rehabilitation services to employees who cannot return to their previous job in any capacity." The letter noted that the rehabilitation program was voluntary, and that "[u]pon agreeing to participate in this program and while continuing to participate, [the plaintiff] will be eligible to receive . . . workers' compensation benefits at the temporarily totally disabled rate."

The plaintiff met with a representative from Genex on June 1, 1999, and signed a document entitled "Notification Regarding Rehabilitation Services . . . Hierarchy of Rehabilitation Services." In accordance with regulations promulgated by the Workers' Compensation Division,[1] the document listed the seven steps in the "required hierarchy of rehabilitation services" as follows:

1. Return of the employee to the pre-injury job with the same employer.

2. Return of the employee to the pre-injury job with the same employer with modification of tasks, work structure and work hours.

3. Return to employment with the pre-injury employer in a different position.

> 4.1.1. Return of the injured worker to the preinjury job with the same employer;
> 4.1.2. Return of the injured worker to the preinjury job with the same employer and with modification of task, work structure or work hours;
> 4.1.3. Return of the injured worker to employment with the same employer in a different position;
> 4.1.4. Return of the injured worker to employment in a different position with the same employer and with on-the-job training;
> 4.1.5. Employment of the injured worker by a new employer and without training;
> 4.1.6. On-the-job training of the injured worker for employment with a new employer; or
> 4.1.7. Enrollment of the injured worker in a retraining program which consists of a goal-oriented period of formal retraining designed to lead to suitable gainful employment in the labor market; provided, that there exists a reasonable expectation of the injured worker actually obtaining such employment upon completion of the program.

---

1. The regulation, 85 C.S.R. § 15-4 establishes the following seven "priorities" that are to be followed in providing rehabilitation services. The regulations specify that the workers' compensation commissioner must use the lower-numbered priorities unless the commissioner—and *not* a private rehabilitation service provider—determines that those priorities are "inappropriate" for the injured claimant. Only then may a higher-numbered priority be attempted. *See State ex rel. McKenzie v. Smith,* 212 W.Va. 288, ——, 569 S.E.2d 809, 825 (2002).

The regulation states:
4.1. Qualified rehabilitation professionals must utilize the following priorities. No higher numbered priority may be utilized unless the commissioner has determined that all lower numbered priorities are unlikely to result in the placement of the injured worker into suitable gainful employment. If a lower numbered priority is clearly inappropriate for the injured worker, the next higher numbered priority must be utilized. The rehabilitation plan *must* explicitly *state* the *reasons* and rationale for the rejection of any lower numbered priority. The priorities are as follows:

4. Return to employment with pre-injury employer with on-the-job training.

5. Employment with a new employer without training.

6. On-the-job training for employment with a new employer.

7. Retraining which shall consist of a goal-oriented period of formal retraining which is designed to lead to suitable gainful employment.

The document also states, at the top, that "[c]lear objective documentation must exist indicating that the lower numbered plan is not appropriate in the given claim before a higher number can be considered."

At the bottom of the document is the statement that Genex had "explained those rehabilitation services that could be made available" to the plaintiff, and had "recommended number 5 of the hierarchy of rehabilitation services." In other words, Genex recommended that the plaintiff be employed with a new employer without receiving any training. The plaintiff checked a box at the bottom stating he was "willing and agree[d] to participate in rehabilitation services at this time," and signed the document.

Subsequently, on July 12, 1999, approximately six weeks after signing the Genex document, the plaintiff was sent a form letter by the defendant informing him his employment was terminated because "[i]t has been determined from your medical records that your physical condition is such that is [sic] prevents you from returning to your regular work at the mine." No mention is made in the letter about the Genex document signed by the plaintiff.

The defendant, however, now characterizes the Genex document as, essentially, a contractual agreement by the plaintiff to accept rehabilitation services with the goal of obtaining employment with a new employer. In other words, the defendant interpreted the plaintiff's "voluntary" acceptance of rehabilitation services as his written concession that his physical condition was not going to improve, and that he was prevented by his physical condition from ever returning to employment with the defendant. On the basis of this "voluntary" statement by the plain-tiff—as well as the plaintiff's medical records—his employment was terminated.

The plaintiff, however, argues that when he signed the document he did not intend to "voluntarily" give up his job with the defendant—instead, he argues he signed the document intending to accept whatever rehabilitation services Genex would provide. He also argues that his medical records support that he could return to work at his prior position.

Furthermore, the plaintiff contends that his referral to rehabilitation at Step Five was part of a complex scheme by the defendant to discriminate against employees who receive workers' compensation benefits. He asserts that contrary to the statement at the top of the document, Genex had no "clear objective documentation ... indicating that the lower numbered plan[s]" were not appropriate in the plaintiff's case. The plaintiff asserts that the defendant has produced no documentation indicating why Steps One through Four of the rehabilitation hierarchy were ignored. Instead, the plaintiff contends that he was referred directly to Step Five of the rehabilitation hierarchy primarily because of an unwritten company policy of the defendant.

As evidence of this unwritten policy, the plaintiff cites to the deposition of the senior compensation specialist at Acordia who referred the plaintiff for rehabilitation. She testified that:

A. Under Eastern's Employer Managed Rehab Plan claims don't get referred to a rehab specialist until it is Step 5 of the hierarchy, which means they can't return to work for the preinjury employer. And Step 5 is seeking employment with a new employer. . . .

Q. Who made the decision that it was at Step 5? . . .

A. The medical records in the file determined that he was not capable of returning to the preinjury employer, which is Steps 1–4. The file was generated to me by the nurse/case manager on the claim. . . .

Q. So by the time the referral was made to you, by the time the file was given to you, somebody had made the decision that it was at Step 5?

A. Yes.

Furthermore, the Acordia specialist testified that injured employees of the defendant were never referred to rehabilitation for anything other than Step Five. She stated:

A. We work with Eastern Associated Coal closely and know that there is not any modified duty available for injured workers. If they can't return to their preinjury job, then there is no work available for them. . . . We discuss it at claims-review meetings or telephone conversations. . . .

Q. You have had discussions with employees at meetings and conversations and you know . . . that if you can't return to your preinjury job at Eastern you are at Step 5. . . .

A. Yes.

Q. How many cases have you done involving the Eastern people and referrals to rehab?

A. I couldn't give you a specific number . . . . Probably closer to 50, and that is an estimate.

Q. So in every one of those cases you have been aware that if they couldn't return to their past work they are at Step 5 if they agree to go into rehab?

A. Yes. . . .

Q. Would you consider that a policy that you are following? . . . If someone comes to you with a referral to rehab, then they are at Step 5? . . .

A. Yes.

Q. Is that published anywhere?

A. No.

Q. Is it in any documents that you have seen?

A. No.

Q. But it is something that you know routinely?

A. Yes.

Q. Without exception? . . .

A. I have never had an exception.

The plaintiff filed the instant action on September 30, 1999,[2] alleging that he was discriminated against and illegally discharged from his job on account of his receipt of workers' compensation benefits, in violation of *W.Va.Code*, 23–5A–1 [1978]. The plaintiff's theory was that the rehabilitation process utilized by the defendant was discriminatory in nature.

After conducting discovery, and particularly after the above-quoted deposition, the plaintiff moved to amend his complaint to add as defendants Acordia and Genex. He also moved to certify the case as a class action, arguing that the evidence showed that up to 50 other people had lost their jobs with the defendant due to the allegedly discriminatory use of the workers' compensation rehabilitation system by the defendant.

The circuit court did not rule upon the plaintiff's motions. Instead, upon a motion of the defendant, the circuit court granted summary judgment against the plaintiff. In an order dated June 7, 2001, the circuit court found that the plaintiff voluntarily signed the "agreement" to accept rehabilitation services "with a goal of obtaining employment with a new employer." The circuit court also found that the plaintiff received temporary total disability benefits while receiving rehabilitation services, and that the plaintiff never objected to the rehabilitation services provided by the defendant.

The circuit court concluded that the plaintiff "voluntarily participated in the rehabilitation program developed in accordance with the rules and regulations promulgated by the Workers' Compensation Division." Because the plaintiff "acknowledged that his participation was based upon his inability to work with Eastern," the circuit court ruled that the plaintiff could not "voluntarily accept the benefits of the program and then complain that he was not entitled to them." The circuit court therefore held that the plaintiff had failed to establish the elements of a

---

**2.** The procedural history of this case is somewhat convoluted. The plaintiff, acting *pro se*, initially filed the instant action alleging that the defendant deliberately and intentionally harmed him, in violation of *W.Va.Code*, 23–4–2 [1994]. The plaintiff later hired an attorney who, after conducting an investigation, abandoned the plaintiff's "deliberate intent" cause of action. The plaintiff later amended his complaint to assert discrimination in violation of the Workers' Compensation Act.

wrongful discharge cause of action under the Workers' Compensation Act, and granted summary judgment to the defendant.

The plaintiff now appeals the circuit court's June 7, 2001 order.

## II.

### Standard of Review

■ As we stated in Syllabus Point 1 of *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994), we review a circuit court's entry of summary judgment under Rule 56 of the *West Virginia Rules of Civil Procedure* [1998] *de novo*. The traditional standard for granting summary judgment was established in Syllabus Point 3 of *Aetna Cas. & Sur. Co. v. Federal Ins. Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963) where we held:

A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law.

*In accord*, Syllabus Point 1, *Fayette County Nat. Bank v. Lilly*, 199 W.Va. 349, 484 S.E.2d 232 (1997); Syllabus Point 1, *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 459 S.E.2d 329 (1995); Syllabus Point 2, *Painter, supra*.

With this standard in mind, we examine the arguments of the plaintiff.

## III.

### Discussion

The plaintiff contends on appeal that summary judgment was improper because genuine questions of material fact exist regarding whether the defendant unlawfully discriminated against the plaintiff.

■ The Workers' Compensation Act ("the Act"), *W.Va.Code*, 23–5A–1 [1978] establishes the following prohibition against discrimination:

No employer shall discriminate in any manner against any of his present or former employees because of such present or former employee's receipt of or attempt to receive benefits under this chapter.

This Court held, in Syllabus Point 1 of *Powell v. Wyoming Cablevision, Inc.*, 184 W.Va. 700, 403 S.E.2d 717 (1991), that

In order to make a prima facie case of discrimination under W.Va.Code, 23–5A–1, the employee must prove that: (1) an on-the-job injury was sustained; (2) proceedings were instituted under the Workers' Compensation Act, W.Va.Code, 23–1–1, *et seq.*; and (3) the filing of a workers' compensation claim was a significant factor in the employer's decision to discharge or otherwise discriminate against the employee.

The defendant concedes that the plaintiff has satisfied the first two elements of *Powell*, because the plaintiff had an on-the-job injury and filed a workers' compensation claim. The defendant argues, however, that the plaintiff introduced no evidence whatsoever that his discharge was in any way related to his filing of a workers' compensation claim. The defendant argues that the plaintiff, by signing the Genex document, "admitted that he could not return to work,"and that the medical evidence in the case established that the plaintiff was only capable of functioning at the light physical demand level. The defendant therefore contends it was within its rights to terminate the plaintiff because he was medically unable to ever return to his regular job.

■ The plaintiff, however, first argues that a finder of fact could draw inferences from the circumstances and documents in the record that are favorable to the plaintiff, and that summary judgment was therefore inappropriate. As this Court has made clear, courts considering motions for summary judgment "must draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion." *Painter v. Peavy*, 192 W.Va. at 192, 451 S.E.2d at 758. "Summary judgment should be denied 'even where there is no dispute as to the evidentiary facts in the case but only as to the conclusions to be drawn therefrom.' " *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 59, 459 S.E.2d 329, 336 (1995), *quoting Pierce v. Ford Motor Co.*, 190 F.2d 910, 915 (4th Cir.), *cert. denied*, 342 U.S. 887, 72 S.Ct. 178, 96 L.Ed. 666 (1951).

The plaintiff asserts that the Genex document was not an "admission" that he could not return to his job with Eastern, and that the document has an alternate interpretation: it was merely the plaintiff's acknowledgment that he was voluntarily participating in the rehabilitation plan created by the defendant's agent, Genex. Furthermore, the plaintiff asserts that a fact finder could infer from the record that he and his doctors believed all along that he could return to his job. The plaintiff contends that these inferences, which are favorable to the plaintiff's position, can be derived from the existing record and that the circuit court therefore erred in granting summary judgment.

The plaintiff suggests that he did not return to work because he was prevented from doing so by the defendant's policies, which thereby compelled him to "voluntarily" participate in a rehabilitation program—and his participation in the rehabilitation program resulted in his termination from employment. The plaintiff's second argument, therefore, is that the evidence, particularly the deposition of the Acordia compensation specialist, establishes that the defendant is misusing the workers' compensation rehabilitation system to terminate workers who have been seriously injured in the course of and as a result of their employment. The plaintiff asserts that the defendant is violating the rules and statutes concerning workers' compensation rehabilitation by only referring injured workers to rehabilitation at Step Five, whereby the injured worker must seek employment with another employer without receiving any rehabilitation or training. The plaintiff argues that this use of the rehabilitation system constitutes discrimination under the Act.

We begin our consideration of this argument by examining the workers' compensation rehabilitation system. The Act provides benefits to workers' who have "received personal injuries in the course of and resulting from their covered employment[.]" *W.Va. Code*, 23–4–1 [1989]. The benefits available include rehabilitation services such as "vocational or on-the-job training, counseling, assistance in obtaining appropriate temporary or permanent work site, work duties or work hours modification, ... crutches, artificial limbs, or other approved mechanical appliances, or medicines, medical, surgical, dental or hospital treatment[.]" *W.Va. Code*, 23–4–9(b) [1999].

However, the Act clearly requires that the Workers' Compensation Commissioner—and not employers or their agents—develop and direct a claimant's rehabilitation plan. *W.Va. Code*, 23–4–9(b) states, in pertinent part:

[T]he commissioner shall at the earliest possible time determine whether the employee would be assisted in returning to remunerative employment with the provision of rehabilitation services and if the commissioner determines that the employee can be physically and vocationally rehabilitated ... the commissioner shall forthwith develop a rehabilitation plan for the employee and, after due notice to the employer, expend such an amount as may be necessary for the aforesaid purposes[.]

Furthermore, the Act provides that "it is the shared responsibility of the employer, the employee, the physician and the commissioner to cooperate in the development of a rehabilitation process designed to promote reemployment for the injured employee." *W.Va. Code*, 23–4–9(a). However, any rehabilitation process must be "pursuant to a rehabilitation plan developed and monitored by a rehabilitation professional for each injured employee." *W.Va. Code*, 23–4–9(b).

We recently interpreted the statutes pertaining to rehabilitation in *State ex rel. McKenzie v. Smith*, 212 W.Va. 288, 569 S.E.2d 809 (2002). In *McKenzie*, we were asked to examine a system of "employer's preferred providers for rehabilitation services" similar to that in the instant case. The petitioner in that case sought to prohibit the Workers' Compensation Commissioner from referring claimants exclusively to rehabilitation service providers who had contracts with the claimants' employers to be the "employer's preferred provider."

We held, at Syllabus Point 8 of *McKenzie*, that only the Commissioner is empowered by the Workers' Compensation Act to develop a rehabilitation plan for an injured employee, but that such a plan should be a joint effort between the employer, the claimant, the

claimant's physician, a rehabilitation professional, and the Commissioner:

> When the Workers' Compensation Commissioner determines that a claimant is a candidate for rehabilitation services, *W.Va. Code*, 23–4–9 [1999] requires the Commissioner to develop and implement a plan for the claimant's rehabilitation services. The Commissioner must, with the assistance of the claimant's rehabilitation professional develop and monitor the rehabilitation plan, and the employer, the claimant, the claimant's physician and the Commissioner must cooperate in the development of the rehabilitation plan.

From this premise, we examined various statutes and their application to a system whereby employers entered into contracts with rehabilitation service providers to be the exclusive provider of services for injured employees. We held, at Syllabus Point 6, that:

> Under *W.Va.Code*, 23–4–3(b) [1995], an employer is prohibited from entering into any contract with a health care provider for purposes of providing services, including rehabilitation services, to employee-claimants injured in the course of and as a result of their employment.

We noted that this statutory prohibition was of such import to the Legislature that its violation could form the basis for civil and criminal penalties. We further held, at Syllabus Point 7, that:

> Under *W.Va.Code*, 23–4–3(b) [1995], a claimant has a right to select his or her initial health care provider or provider of rehabilitation services for the treatment of a compensable injury or disease. If the claimant thereafter wishes to change his or her provider, and if the employer participates in a program to manage health care costs, then the claimant must choose a provider through the employer's managed care program. If the claimant thereafter wishes to change his or her provider, and if the employer does not participate in a managed care program, but the Division does participate in a managed care program, then the Division may choose the claimant's new provider through its managed care program.

Taken together, the beneficent purpose of these two provisions "is to protect a claimant's interest in determining his or her own course of treatment for a compensable injury." 212 W.Va. at ——, 569 S.E.2d at 820.

We concluded in *McKenzie* that a system of using an "employer's preferred provider for rehabilitation services" was unenforceable under the Act. First, an agreement between an employer and a rehabilitation service provider to be the "employer's preferred provider" of services to employees injured on-the-job would violate *W.Va.Code*, 23–4–3(b) [1995]. Second, requiring an injured claimant to seek initial treatment from a rehabilitation service provider chosen by the employer would also violate a claimant's right to choose his or her initial provider of services, as required by *W.Va.Code*, 23–4–3(b) [1995]. Lastly, only the Commissioner—and not the employer—has the authority to develop a rehabilitation plan for a claimant, with the assistance of a rehabilitation professional, and with the cooperation of the employer, the claimant, and the claimant's physician.

In the instant case, the defendant crafted a complicated system that appears to be contrary to each of the statutes discussed in *McKenzie*. The defendant had an agreement with Acordia and Genex to provide rehabilitation services for employees such as the plaintiff who were injured on the job. Furthermore, the plaintiff was not given an opportunity to initially choose his own rehabilitation service provider (and, in fact, does not appear to have even sought rehabilitation services). Lastly, the defendant—and not the Commissioner—referred the plaintiff to Genex, incorrectly suggesting in the referral letter that rehabilitation services are only for "employees who cannot return to their previous job in any capacity," and created a rehabilitation plan that began at Step Five, all without any consultation with the Commissioner.

After carefully reviewing the record, we can infer that the defendant may have employed this complicated system to remove from its payroll employees who sustain injuries in the course of and resulting from their employment. To begin, in a letter written to

the plaintiff's doctor 18 days after the plaintiff's injury, a representative for the defendant indicated that as part of the defendant's "approved" rehabilitation program, the plaintiff could not be returned to work without having a functional capacity evaluation. This letter was written 20 months before the plaintiff was ever referred to the rehabilitation program, and the functional capacity evaluation (performed four to eight months before the plaintiff had completed his recovery from his injuries) was, in part, the basis for the plaintiff's referral.

Furthermore, even though two doctor's reports indicated the plaintiff could return to the defendant for work, a claims representative at Acordia unilaterally determined that the plaintiff should instead be referred to a rehabilitation provider, Genex.

Remarkably, the claims representative, and not the rehabilitation provider, appears to have determined that rehabilitation should begin at Step Five—that is, that the plaintiff was to obtain a job with another employer without receiving any training. As previously stated, the regulations of the Division "place the responsibility for classifying a claimant's condition in the rehabilitation hierarchy in the Commissioner," and not in the employer. *McKenzie*, 212 W.Va. at ——, 569 S.E.2d at 825. Workers' compensation regulations state:

> No higher numbered priority may be utilized unless the *commissioner* has determined that all lower numbered priorities are unlikely to result in the placement of the injured worker into suitable gainful employment.

85 C.S.R. § 15–4.1 (emphasis added). The record suggests that the defendant's representative at Acordia never referred a claimant employed by the defendant to rehabilitation at any step other than Step Five, and had done so in approximately 50 other cases. We presume that in each of these cases, as

with the plaintiff's case, the claimant's job with the defendant was terminated.

In sum, the defendant relied upon a system that apparently was in contravention of the Workers' Compensation Act, and that was employed in a fashion contrary to the dictates of the workers' compensation statutes and regulations, to suggest that the plaintiff "voluntarily" relinquished his job and sought employment elsewhere because he was unable to perform his job, or any job, with the defendant.

■ We believe that an employer's use of a rehabilitation system, particularly one that is contrary to the Act, as discussed in *State ex rel. McKenzie v. Smith*, to remove an injured employee from the payroll may form the basis for a *prima facie* case of discrimination under the Act. We hold that an employer's termination of the employment of an injured employee because the employee *voluntarily* accepted rehabilitation services may support a claim for workers' compensation discrimination under *W.Va.Code*, 23–5A–1.

■ We believe that the employer's use of a system of preferred providers for rehabilitation services in the instant case could be interpreted as a pretext for a scheme to terminate employees who had received workers' compensation benefits. We therefore find that substantial questions of material fact remain, and that the circuit court erred in granting summary judgment to the defendant.[3]

## IV.

### Conclusion

We reverse the circuit court's June 7, 2001 summary judgment order, and remand this case for further proceedings.

Reversed and Remanded.

---

3. The plaintiff also contends that the circuit court erred in not allowing the plaintiff to amend his complaint to add as defendants Acordia and Genex and add an additional cause of action for fraud, and in not allowing the plaintiff to certify a class action on behalf of other individuals affected by Eastern Associated's, Acordia's, and Genex's alleged misconduct. Because the circuit court did not reach the merits of these motions by the plaintiff, we decline to address them, and leave them for the circuit court to address on remand.

Chief Justice DAVIS concurs and files a concurring opinion joined by Justice MAYNARD.

DAVIS, Chief Justice, concurring:

(Filed July 17, 2002)

In this case, the majority reversed an order granting summary judgment to the appellee, Eastern Associated Coal Corp., and remanded the action to allow Mr. Skaggs to pursue his claim of discriminatory termination.[1] I agree with this disposition. However, I have chosen to write separately because I strongly disagree with the majority's partial reliance upon the decision in *State ex rel. McKenzie v. Smith*, 212 W. Va. 288, 569 S.E.2d 809 (2002), in resolving this appeal.

*McKenzie* was wrongly decided and has no application to Mr. Skaggs' case.[2] The decision in *McKenzie* concerned the discretionary authority of the Commissioner to allow employers to submit a list of preferred vocational rehabilitation service providers. Thus, *McKenzie* has no relevance to the instant claims involving discriminatory termination. The issue posed by Mr. Skaggs was controlled exclusively by our prior decisions concerning discrimination under W. Va.Code § 23–5A–1 (1978) (Repl.Vol.1998), and this case should have been resolved on that basis alone.

In view of the foregoing, I concur. I am authorized to state that Justice MAYNARD joins me in this concurring opinion.

---

1. Under W. Va.Code § 23–5A–1 (1978) (Repl.Vol. 1998) an employer may not terminate an employee as a result of the employee receiving workers' compensation benefits. The statute provides succinctly: "No employer shall discriminate in any manner against any of his present or former employees because of such present or former employee's receipt of or attempt to receive benefits under this chapter."

2. I dissented in *McKenzie* on the basis that the majority did not have authority to rewrite work-

ers' compensation statutes, under the guise of the rule of liberality, in order to undermine the discretionary authority of the Commissioner of the Workers' Compensation Division to allow employers to submit the names of preferred vocational rehabilitation providers. *See State ex rel. McKenzie v. Smith*, 212 W. Va. 288, 569 S.E.2d 809 (2002) (Davis, C.J., dissenting, with Maynard, J., joining).