IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2019 Term

_____

No. 18-0145

_____

FILED

June 6, 2019

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

JOSEPH C. THORTON, AS EXECUTIVE DIRECTOR,
GOVERNOR'S COMMITTEE ON CRIME, DELINQUENCY, AND
CORRECTION,
Respondent Below, Petitioner

V.

WILLIAM M. WARD,
Petitioner Below, Respondent

_____

Appeal from the Circuit Court of Ohio County
The Honorable Ronald E. Wilson, Judge
Civil Action No. 16-C-368

REVERSED AND REMANDED

_____

Submitted: March 6, 2019
Filed: June 6, 2019

Patrick Morrisey
Attorney General
Thomas T. Lampman
Assistant Attorney General
Charleston, West Virginia
Attorneys for the Petitioner

Joseph J. John
John & Werner Law Offices, PLLC
Wheeling, West Virginia
Attorney for the Respondent

JUSTICE JENKINS delivered the Opinion of the Court.

**SYLLABUS BY THE COURT**

1.      "'On appeal of an administrative order from a circuit court, this Court is bound by the statutory standards contained in W. Va. Code § 29A-5-4(a) and reviews questions of law presented *de novo*; findings of fact by the administrative officer are accorded deference unless the reviewing court believes the findings to be clearly wrong.' Syl. Pt. 1, *Muscatell v. Cline*, 196 W. Va. 588, 474 S.E.2d 518 (1996)."  Syllabus point 1, *Straub v. Reed*, 239 W. Va. 844, 806 S.E.2d 768 (2017).

2.      "In cases where the circuit court has amended the result before the administrative agency, this Court reviews the final order of the circuit court and the ultimate disposition by it of an administrative law case under an abuse of discretion standard and reviews questions of law *de novo*." Syllabus point 2, *Muscatell v. Cline*, 196 W. Va. 588, 474 S.E.2d 518 (1996).

**Jenkins, Justice:**

Petitioner Joseph C. Thorton,[1] Executive Director of the Governor's Committee on Crime, Delinquency, and Corrections[2] (the "Executive Director"), herein appeals from the January 23, 2018 order of the Circuit Court of Ohio County reversing the Executive Director's order decertifying Respondent William Ward ("Mr. Ward") as a law enforcement officer in the State of West Virginia. On appeal, the Executive Director raises two issues: (1) whether the circuit court erred by applying the incorrect statutes to define the scope of the Law Enforcement Professional Standards Subcommittee's[3] ("Subcommittee") authority and (2) whether the circuit court erred by incorrectly applying the due process protections in employment disputes to a proceeding governing law enforcement professional certification. Upon careful review of the briefs, the appendix

---

[1] Since the filing of the appeal in this case, the executive director of the Governor's Committee on Crime, Delinquency and Correction has changed from W. Richard Staton to Joseph C. Thorton. By Order entered March 19, 2019, the Court has made the necessary substitution of parties pursuant to Rule 41(c) of the West Virginia Rules of Appellate Procedure.

[2] The Governor's Committee on Crime, Delinquency, and Correction ("the Governor's Committee") was "established as a state planning agency pursuant to § 15-9-1 of [the West Virginia Code.]" W. Va. Code § 30-29-1(5) (LexisNexis 2018).

[3] The Subcommittee was continued pursuant to West Virginia Code § 30-29-2. W. Va. Code § 30-29-2 (LexisNexis 2018). Essentially, the Subcommittee has the "following responsibilities: (1) Review and administer programs for qualification, training and certification of law-enforcement officers in the state; and (2) Consider applications by law-enforcement officers whose certification is deemed inactive as a result of his or her separation from employment with a law-enforcement agency." *Id.* The West Virginia Code further provides that the Subcommittee shall "[c]ertify or decertify or reactivate law-enforcement officers[.]" W. Va. Code § 30-29-3(a)(11) (LexisNexis 2018).

record, the arguments of the parties, and the applicable legal authority, we find that the circuit court erred by applying the incorrect statutory provisions to this matter and the proceedings below. Furthermore, because the circuit court applied the incorrect statutory provisions, its conclusion that the civil service hearing proceedings must precede decertification proceedings is also in error. Therefore, we reverse the order of the circuit court and remand the case for further proceedings consistent with this opinion.

# I.

## FACTUAL AND PROCEDURAL HISTORY

In March 2015, Mr. Ward was a certified law-enforcement officer employed by the Wheeling Police Department with the rank of corporal.[4] On March 25, 2015, Mr. Ward and his then-girlfriend, Paula Brown ("Ms. Brown"),[5] were involved in an incident inside Mr. Ward's Wheeling residence. On this day, an argument and physical altercation occurred seemingly over a series of text messages regarding Mr. Ward's contact with his former wife. Mr. Ward asked that Ms. Brown leave the premises and take her possessions and children with her.[6] According to the Criminal Complaint, Ms. Brown then "went

---

[4] At the time of the incident, Mr. Ward had been a certified law-enforcement officer with the City of Wheeling Police Department for eleven years.

[5] The record before us indicates that Ms. Brown and her children were living with Mr. Ward at his home located on Wheeling Island.

[6] The record indicates that the children may have also been present during this incident.

downstairs and took Mr. Ward's duty weapon, ID, and keys" before attempting to leave the residence with those items. The Criminal Complaint further alleges that Mr. Ward "got the weapon off of [Ms. Brown] and [he] went to call 911"; that he set his retrieved duty weapon down; that he recalled that Ms. Brown still had his ID and keys; and that he "ran down the stairs, caught [Ms. Brown] at the garage door and the force of their body weight broke the garage window." The Criminal Complaint indicates that Mr. Ward then "walked back into the kitchen where he noticed his duty weapon was missing again." At this point, Ms. Brown left the residence. It was later determined that Ms. Brown had "left the weapon at the residence and she had hid it in the garage above the light." On that same date, both Mr. Ward and Ms. Brown sought domestic violence protective orders, but those petitions were withdrawn or dismissed at the request of the respective parties.

As a result of the incident, the Ohio County Sheriff's Department investigated and caused the filing of two criminal charges against Mr. Ward: (1) brandishing a weapon, in violation of West Virginia Code § 61-7-11 and (2) domestic battery, in violation of West Virginia Code § 61-2-28(a). Initially, Mr. Ward pleaded not guilty to the charges and was released on bond. One of the terms of Mr. Ward's bond was that he was prohibited from possessing a firearm. Additionally, the Wheeling Police Department placed Mr. Ward on administrative leave with pay from his employment subsequent to the arrest and pending an internal investigation. Following the conclusion of the internal investigation, in June 2015, the Chief of the Wheeling City Police

3

Department, Shawn Schwertfeger ("Chief Schwertfeger"), recommended to the City of Wheeling that Mr. Ward be terminated.

In February 2016, on the eve of trial, the special prosecutor, Ms. Brown, Mr. Ward, and the City of Wheeling reached essentially a pretrial diversion agreement on the pending criminal charges. Specifically, it was agreed that the brandishing charge would be dismissed with prejudice and the domestic battery charge would be resolved with Mr. Ward entering a provisional no contest plea. Additionally, the plea agreement continued a term of Mr. Ward's bond, whereby Mr. Ward remained unable to possess a firearm until October 2016.[7] The Agreement also contained provisions that Mr. Ward would retain his employment as a police officer and would return to full time employment as a police officer over the course of the Agreement if the terms thereof were met. However "if Mr. Ward was found to have violated any term of the agreement he would be automatically found guilty of the underlying charge and be subject to a six (6) month jail sentence." The magistrate court approved that plea agreement by order entered April 25, 2016.

---

[7] The terms of the Provisional Plea Agreement included, but were not limited to the following:

a. Mr. Ward would enter a plea of no contest to the offense of Domestic Battery and agreed that if the terms of the Agreement were violated he would face a term of up to 6 months in jail, however, if the terms were complied with then the plea would not be entered and the charge of Domestic Battery would be dismissed;

b. The court would defer consideration of the no contest plea for a period of two years to allow the terms to be met; and

c. The State would dismiss the charge of brandishing with prejudice.

4

While Mr. Ward's criminal case was pending, the Subcommittee learned of the incident and charges. As part of the end-of-year compliance check of all law enforcement officers' ongoing in-service training and firearms qualification requirements, Mr. Ward was flagged as not having kept up with the mandatory firearm qualifications. On September 10, 2015, the Subcommittee initiated communications with the Wheeling Police Department ("the Department"), informing them that the Subcommittee had flagged Mr. Ward regarding his firearms qualifications for the 2015 training year. When the Subcommittee inquired of the Department, the Department informed the Subcommittee that Mr. Ward was excused from that requirement due to him being on extended administrative leave with pay. The Department further informed the Subcommittee that Mr. Ward was on administrative leave because of a domestic violence related arrest. The next communication between the Subcommittee and the Department was again initiated by the Subcommittee. On October 1, 2015, the Subcommittee sent an email to the Department to "follow up on the charges against William Ward." The email further inquired as to whether the incident was "wrapped up or it is all still pending" and whether Mr. Ward was "currently on leave or has he separated from the department." Chief Schwertfeger responded the same day answering all the questions from the Subcommittee: he indicated that the charges were still pending; the City had not yet acted upon his recommendation of termination; and Mr. Ward remained on administrative leave with pay.

Following a February 1, 2016 news report describing Mr. Ward's no-contest plea to the domestic battery charge, the Subcommittee informed Mr. Ward that his law

enforcement officer certification would be reviewed. More specifically, the Subcommittee sent a notification letter to Mr. Ward dated March 8, 2016, stating that "[a]s a result of the provisional plea which you have entered in Ohio County Magistrate Court as part of Case No. 15-M-546 a review of the status of your certification as a law enforcement officer in West Virginia has been set."[8]

As a part of the Subcommittee review proceeding, the Subcommittee provided an "Overview of Appearance Before the LEPS Subcommittee," which included procedural information about the proceeding.[9] On April 28, 2016, Mr. Ward, with counsel, appeared before the Subcommittee. The Subcommittee heard testimony from four witnesses and considered sixty-seven exhibits.[10] Mr. Ward submitted two exhibits and gave his account of events. Mr. Ward's attorneys also "spoke with members [of the Subcommittee] concerning [Mr. Ward's] actions in the matter being reviewed and the disposition of the charges against him." During this proceeding, it appears the witnesses

---

[8] We note that an actual copy of the March 8, 2016 letter is not included in the Joint Appendix Record submitted by the parties. Therefore, this language comes from Mr. Ward's underlying Petition For Review/Appeal filed with the Circuit Court of Ohio County.

[9] As the Executive Director noted in his November 10, 2016 decision, this "Overview" is an ill-prepared document and the Subcommittee should rewrite the document to more accurately indicate the nature of the proceeding. Additionally, we agree with the Executive Director that the Subcommittee "should either follow these procedures or amend them to reflect the actual practice."

[10] The Subcommittee also provided these sixty-seven exhibits via email to Mr. Ward prior to the April 28, 2016 meeting.

were not sworn and numerous witnesses were questioned by the Subcommittee while they were in the room together, rather than one at a time. The witnesses also were not subject to cross-examination, and there was no record made of the proceeding.

After taking the evidence, the Subcommittee unanimously concluded that Mr. Ward was in violation of several law-enforcement professional standards.[11] Based on those findings, on April 29, 2016, the Subcommittee issued an immediate stop work order and decertified Mr. Ward as a law enforcement officer. On May 26, 2016, the Subcommittee memorialized its decision in a written Position Statement ("Position Statement"). As a result, Mr. Ward was forbidden from taking or holding any sworn law enforcement position in West Virginia. The Subcommittee notified Mr. Ward that he could contest its decision pursuant to West Virginia Code of State Regulations § 149-1-1. On August 1, 2016, the City of Wheeling terminated Mr. Ward's employment.[12]

---

[11] These standards included the following: (1) having admitted the commission of or been convicted of a felony or any crime involving dishonesty, unlawful sexual conduct, physical violence, or driving under the influence of alcohol or drugs, or having been placed in or participated in any pretrial diversion or equivalent program for the same; (2) an inability to lawfully carry a firearm under state and/or federal statute; and (3) any conduct or a pattern of conduct unbecoming to a law enforcement officer or law enforcement official or activities that would tend to disrupt, diminish, or otherwise jeopardize public trust and fidelity in law enforcement.

[12] Notably, the termination letter from the City of Wheeling states that there were two reasons for Mr. Ward's termination: 1) the bond restriction imposed upon Mr. Ward which prohibited him from possessing a firearm had not been lifted and 2) his law enforcement certification had been revoked. As such, the City of Wheeling noted that Mr. Ward was unable to fulfill his responsibility under the terms of Paragraph 9 of the Provisional Plea Agreement and Agreed Order, which provided that after "six (6) months form the date of this Agreement, the bond restriction currently imposed on Mr. Ward that

7

Mr. Ward then timely filed an appeal. Represented by counsel, Mr. Ward appeared before the Governor's Committee's Hearing Examiner[13] on August 10, 2016, for a *de novo* review of his case. Mr. Ward had the opportunity to have an evidentiary hearing on the record, to be represented by counsel, to call and cross-examine witnesses, and to make arguments. During this review hearing, Mr. Ward did, in fact, advance several procedural and jurisdictional challenges, introduce an additional exhibit, and extensively cross-examine the Subcommittee's witnesses.[14] On November 10, 2016, the Executive Director issued his Findings of Fact and Conclusions of Law and Final Ruling on Administrative Appeal ("Executive Director's Written Decision").[15] Based on what he contends was an independent review of the hearing transcript and the record, the Executive Director ultimately agreed with the conclusions of the Subcommittee, adding that Mr.

---

prohibits him from possessing a firearm shall be lifted, and he shall be returned to full-time duty[.]"

[13] The hearing examiner was a designee of the Executive Director.

[14] The Subcommittee had five witnesses: Nicole Seifert, Corporal of the Ohio County Sheriff's Office; William Nolan, Sergeant of the Wheeling Police Department; Chief Schwertfeger; Thomas McComas, Sheriff of the Cabell County Sheriff's Department; and Eric Michael Gordon, Assistant Prosecutor of Marshall County. Mr. Ward called only Charles Sadler, Manager of the Law Enforcement Professional Standards Program during this review hearing.

[15] The Executive Director noted that after the review hearing, the "Hearing Examiner issued a nonbinding recommended decision to [him] in [his] capacity as Executive Director of the Governor's Committee on Crime, Delinquency and Correction." The Executive Director further made note that he reviewed all of the findings and recommendations of the Hearing Examiner and that "[s]ome of the findings are incorporated into [his Decision]" and "[s]ome findings are modified or rejected."

8

Ward's failure to disclose his inability to lawfully carry a firearm constituted an additional basis for his decertification.

Mr. Ward timely appealed the Executive Director's Written Decision to the Circuit Court of Ohio County asserting several errors in the administrative hearing process. In its January 24, 2018 memorandum order reversing the Executive Director's Written Decision ("Final Order"), the circuit court found that "the statutory sanctions possessed by the . . . Subcommittee can not [sic] be applied to a city police officer if those sanctions would interfere with the officer's unequivocal right to exercise the due process rights established by West Virginia Code [§] 8-14-20. Those sanctions would only apply – if any remained – after those due process rights had been complied with [sic]." The circuit court further held that Mr. Ward "was subject to the civil service provisions of Article 14 of Chapter 8, section 20, and he could only be removed, discharged, suspended or reduced in rank or pay for just cause and he could not [be] removed, discharged, suspended or reduced in pay 'except as provided by the civil service provisions of this article.'"

Accordingly, the circuit court held that Mr. Ward had a right to be furnished with a written statement of the reasons for the action taken against him and then given an opportunity to file a written answer furnished to the Policeman Civil Service Commission. Following such answer, he was entitled to a public hearing within a period of ten days from the filing of the charges in writing or his written answer. The circuit court found that the burden of proof at that hearing would be upon the City of Wheeling to show just cause for

9

its actions. The circuit court determined that Mr. Ward was not provided with his rights under West Virginia law and that "[n]one of the proceeding that took place before Hearing Examiner Earl W. Maxwell is relevant to this decision. The . . . Subcommittee had no right to revoke the law enforcement certification of [Mr. Ward], a police officer with the city of Wheeling Police Department." Based on these findings, the circuit court reversed the order decertifying Mr. Ward and granted Mr. Ward's appeal. The Executive Director appeals from this Final Order.

## II.

## STANDARD OF REVIEW

With respect to the applicable standard of review, this Court has held that:

> "[o]n appeal of an administrative order from a circuit court, this Court is bound by the statutory standards contained in W. Va. Code § 29A-5-4(a) and reviews questions of law presented *de novo*; findings of fact by the administrative officer are accorded deference unless the reviewing court believes the findings to be clearly wrong." Syl. Pt. 1, *Muscatell v. Cline*, 196 W. Va. 588, 474 S.E.2d 518 (1996).

Syl. pt. 1, *Straub v. Reed*, 239 W. Va. 844, 806 S.E.2d 768 (2017). Furthermore, "[in] cases where the circuit court has amended the result before the administrative agency this Court reviews the final order of the circuit court and the ultimate disposition by it of an administrative law case under an abuse of discretion standard and reviews questions of law *de novo*." Syl. pt. 2, *Muscatell*, 196 W. Va. 588, 474 S.E.2d 518. With these standards in mind, we review the parties' arguments.

10

**III.**

**DISCUSSION**

*A.	The circuit court applied the incorrect statutes to define the scope of the Law Enforcement Professional Standards Subcommittee's authority to decertify law enforcement officers*

In his first assignment of error, the Executive Director contends that the circuit court misread the applicable statutes and ignored the statutory basis for the Subcommittee's authority to decertify Mr. Ward.[16] We agree. Specifically, the Final Order fails to analyze the applicable statutes that govern the Subcommittee in regulating the profession of law enforcement in West Virginia. As the Executive Director aptly notes, the Final Order "contains incorrect statutory citations and summaries, and effectively removes the governing code sections from consideration."

---

[16] As a preliminary matter, Mr. Ward asserts that the Executive Director lacks standing to pursue this appeal. We have previously held that, "[t]o entitle any person to obtain a writ of error or appeal from a judgment, he must be both a party to the case and be aggrieved by the judgment." Syl. pt. 1, *Williamson v. Hays*, 25 W. Va. 609, 609 (1885). *See also Doe v. Pub. Citizen*, 749 F.3d 246, 257 (4th Cir. 2014) (internal citations omitted) ("As a general rule, only named parties to the case in the district court and those permitted to intervene may appeal an adverse order or judgment. Indeed, it is typically only parties who are bound by a judgment and sufficiently aggrieved by it who possess constitutional and prudential standing to seek appellate review of the district court's decision."). In the present matter, Mr. Ward's petition and the circuit court's order named the Executive Director as a respondent and the circuit court's order specifically reversed "the Order of the Director decertifying [Mr. Ward.]" Consequently, we find that the Executive Director has standing to appeal the circuit court's order reversing the Executive Director's Written Decision decertifying Mr. Ward.

11

In particular, in the circuit court's five-page order, it analyzes a subsection of the West Virginia Code—§ 30-29-3(a)(5)—rather than the applicable section of the West Virginia Code—§ 30-29-5. Additionally it misreads West Virginia Code § 30-29-3(a)(11). This erroneous application is a substantial and substantive flaw in the Final Order because these statutory provisions discuss very different issues.

First, the circuit court reviewed and relied upon its interpretation of West Virginia Code § 30-29-3(a)(5) in reversing the Executive Director's Written Decision. West Virginia Code § 30-29-3(a)(5) provides only that the Subcommittee shall "[m]aintain a list of approved law-enforcement instructors[.]" This provision has absolutely no bearing on the issues raised below and was neither cited to nor relied upon by the Executive Director in his Written Decision.[17] However, the Executive Director did cite to and rely on West Virginia Code § 30-29-5 in support of his Written Decision. West Virginia Code § 30-29-5 (LexisNexis 2018), which is the proper section for analysis, provides the certification requirements and gives the authority to the Subcommittee to decertify a law enforcement officer. In particular, West Virginia Code § 30-29-5(h) provides that "[t]he [S]ubcommittee, or its designee, may decertify or reactivate a law-enforcement officer pursuant to the procedure contained in this article and legislative rules promulgated by the [S]ubcommittee." West Virginia Code § 30-29-5(i) further provides the statutory

---

[17] In its Final Order, the circuit court even commented that this section "adds nothing [to the analysis] because it simply requires that a list be maintained on approved law-enforcement officers."

procedure for "[a]ny person aggrieved by a decision of the [S]ubcomittee . . . [to] contest the decision[.]" Accordingly, it is clear that the circuit court relied on the wrong statutory provision in arriving at its decision in this matter.

Second, the circuit court discussed and relied upon its interpretation of West Virginia Code § 30-29-3(a)(11). This provision provides that the Subcommittee has the authority to certify or decertify a law enforcement officer. However, the circuit court stated in its order that this provision was ambiguous because "the [S]ubcommittee is charged with certifying or decertifying or reactivating law enforcement officers 'as provided in' section 3(a)(11) of article 29 (the same section) . . . ." This is an incorrect statement. West Virginia Code § 30-29-3(a)(11) actually provides that the Subcommittee may "[c]ertify or decertify or reactivate law enforcement officers, as provided *in sections five [§ 30-29-5] and eleven [§ 30-29-11]*." W. Va. Code § 30-29-3(a)(11) (emphasis added). As such, the circuit court erred by finding West Virginia Code § 30-29-3(a)(11) ambiguous because Section 11 of Article 29 is not the "same section," but rather refers to § 30-29-11 which is titled "Certified law-enforcement officers who are separated from their employment." This was critical because it demonstrated that the circuit court did not apply or consider any statutory provisions that guide the decertification process beyond the foundational provision of West Virginia Code § 30-29-3(a)(11), such as West Virginia Code § 30-29-5.

The circuit court's misapplication of the applicable statutes ignores the statutory basis for the Subcommittee's authority to certify or, as in the instant matter,

13

decertify a law-enforcement officer. This distinction is a crucial issue because the statutory provisions and related regulations ignored by the circuit court lay out the foundation and procedures for the decertification process and the Subcommittee or its designee's authority to implement these procedures. According to the Executive Director, these misapplied statutory provisions laid out the core of his argument: that the Subcommittee of the Governor's Committee, or its designee, has the sole authority to decertify law enforcement officers in West Virginia and that the statutory language does not allow for the decertification provisions to be subordinate to the civil service provisions. As such, it is imperative that the circuit court apply the correct statutory provisions.

This Court has previously found that applying incorrect statutes in a particular matter is, in itself, reversible error. *Mott v. Kirby*, 225 W. Va. 788, 789, 696 S.E.2d 304, 305 (2010) ("Because this Court finds that the circuit court applied the wrong statute to the proceedings below, we reverse and remand for proceedings consistent with this opinion."); *see also Taylor v. Steager*, No. 16-0910, 2018 WL 1674228, at *1 (W. Va. Apr. 6, 2018) (memorandum decision) ("However, because the circuit court applied the incorrect statute, we conclude that the circuit court's reversal of the OTA's final decision was erroneous.").

Furthermore, while Mr. Ward responded in his brief with a plethora of different arguments, he failed to respond to this first assignment of error. At no point in his brief does Mr. Ward argue that the circuit court did, in fact, analyze and rely on the

14

correct statutory provisions or that even if the circuit court did misapply the statutes, that it was not reversible error. West Virginia Rule of Appellate Procedure 10(d) provides that "[u]nless otherwise provided by the Court, *the argument section of the respondent's brief must specifically respond to each assignment of error*, to the fullest extent possible. *If the respondent's brief fails to respond to an assignment of error, the Court will assume that the respondent agrees with the petitioner's view of the issue.*" (Emphasis added). Accordingly, we rule against Mr. Ward.

### B. The circuit court incorrectly applied the due process protections in employment disputes to a proceeding governing law enforcement professional certification, confusing an administrative action with an employment decision

In the Executive Director's second assignment of error, he contends that the circuit court erred by incorrectly applying the due process protections in employment disputes contained within the civil service statute, West Virginia Code § 8-14-20, to an entirely separate and distinct proceeding governing law enforcement professional certification, which is codified in West Virginia Code §§ 30-29-1 *et seq*. Particularly, the Executive Director contends that the circuit court erred by subordinating the professional decertification procedures to civil service discipline or termination procedures.

Significantly, Mr. Ward's response fails to articulate any argument or response as to why the civil service provisions must be invoked prior to the Subcommittee instituting decertification proceedings, except for this vague hypothetical question: "If the lower court's order is not affirmed, why would any police department ever initiate

15

termination or disciplinary proceedings . . . when the police department can just have the [] Subcommittee do the same thing without all the necessary requirements, formalities[,] and protections?" We further note that Mr. Ward's response fails to give any explanation as to why the civil service statutory scheme does not make any mention of the decertification process or why there are separate statutory provisions under the decertification statutory scheme for law enforcement officers who are separated from employment. Accordingly, we agree with the Executive Director that the civil service employment statutory scheme is entirely separate and independent from the law enforcement decertification administrative scheme.

First and foremost, it is important to review the significance and importance of the statutory scheme for decertifying law enforcement officers. "The most common state legislative and administrative approach for addressing police misconduct,[18] which is

---

[18] As scholars have noted,

> [t]raditional remedies for police misconduct fail to address the problem caused by the practice of leaving the decision to hire and fire officers up to local sheriffs and chiefs. This often leads to situations where unfit officers are able to continue to work for a department that is unable or unwilling to terminate them. Even when they are terminated, these officers often go to work for other departments within the state. Although virtually every other profession is regulated by a state board with the power to remove or suspend the licenses or certificates of unfit members of the profession (*e.g.*, attorneys, physicians, teachers), there has been a longstanding tradition of local control of police without state involvement.

16

largely unknown to scholars and the public even though it has been adopted by forty-three states, involves revocation of the officer's state certificate or license that is issued upon successful completion of state-mandated training." Roger L. Goldman & Steven Puro, *Revocation of Police Officer Certification: A Viable Remedy for Police Misconduct?*, 45 St. Louis U. L.J. 541, 542 (2001) (footnote omitted). Furthermore, "[a]s opposed to termination of employment by a local department, which does not prevent the officer from being rehired by a different department, revocation of the certificate prevents the officer from continuing to serve in law enforcement in the state." *Id.* (footnote omitted). This practice of revoking or decertifying a law enforcement officer "has the advantage of insuring that officers cannot continue to practice their profession in the state by suspending or removing state certification." *Id.* at 544. Essentially, this practice "treats the police profession like any other—if minimum standards of performance are not met, the person loses the privilege of continuing in the profession." *Id.* (footnote omitted). Additionally, "[r]ecognizing the need for a law that removes unfit officers from the profession, particularly those engaging in repeated misconduct, most states have adopted revocation laws[.]" *Id.* at 547-48 (footnote omitted).

Since at least the 1980s, the West Virginia Legislature has recognized that law enforcement officers were professionals and authorized either the Governor's

---

Roger L. Goldman & Steven Puro, *Revocation of Police Officer Certification: A Viable Remedy for Police Misconduct?*, 45 St. Louis U. L.J. 541, 545-46 (2001).

Committee or its Subcommittee to promulgate certification requirements and the authority to certify law enforcement officers pursuant to those requirements. *See* W. Va. Code § 30-29-3 (LexisNexis 1986); *see also* W. Va. Code § 30-29-3 (LexisNexis 2018). Moreover, since at least 2012, the Legislature has given either the Governor's Committee, the Subcommittee, or their designee the power to decertify law enforcement officers for certain enumerated conduct. *See* W. Va. Code § 30-29-3 (LexisNexis 2012); *see also* W. Va. Code § 30-29-3 (LexisNexis 2018). Additionally, this Court has been clear in holding that if a board has the power to give a license or certification, it has the inherent power to revoke that same license or certification for good cause, and may do so "whether or not the power to revoke is expressly or impliedly reserved in the licensing statute or in the certificate of license."[19] Syl. pt. 6, in part, *Mounts v. Chafin*, 186 W. Va. 156, 411 S.E.2d 481 (1991). As such, it is evident that our Legislature has recognized the importance of creating a statutory scheme to certify and decertify law enforcement officers like every other regulated profession and the importance of authorizing the Subcommittee or its designee as the only authority to certify and decertify law enforcement officers.

Moreover, the explicit language of each section demonstrates the Legislature's intent to have two separate and independent statutory schemes: one for

---

[19] Syl. pt. 6, *Mounts v. Chafin*, 186 W. Va. 156, 411 S.E.2d 481 (1991) ("A license may be revoked for due cause at any time in accordance with provisions in the licensing act or ordinance or in the certificate of license. A license may also be revoked in the exercise of the police power of the state, whether or not the power to revoke is expressly or impliedly reserved in the licensing statute or in the certificate of license.").

18

protecting a civil service employee's interest in his/her employment and one for protecting the regulation of the law enforcement profession. For instance, the civil service provisions set forth a right for law enforcement officers employed by municipalities to have a hearing before he or she is "removed, discharged, suspended or reduced in rank or pay." W. Va. Code § 8-14-20(a) (LexisNexis 2017). Additionally, we have reiterated that the civil service provisions set forth the requirements "to be followed when a police department removes, discharges, suspends, or reduces the rank or pay of a police officer." *Cline v. Roark*, 179 W. Va. 482, 483 n.2, 370 S.E.2d 138, 139 n.2 (1988). Significantly, the entire text of the civil service provisions make no mention of the decertification process. It is well-established that:

> If the Legislature explicitly limits application of a doctrine or rule to one specific factual situation and omits to apply the doctrine to any other situation, courts should assume the omission was intentional; courts should infer the Legislature intended the limited rule would not apply to any other situation. Hence, a statute which specifically provides that a thing is to be done in a particular manner, normally implies that it shall not be done in any other manner. *See* 73 Am.Jur.2d *Statutes* § 211 (1974). "This canon is a product of logic and common sense, and it has special force when the statutory scheme is carefully drafted." *State v. Sugg*, 193 W. Va. 388, 401 n. 14, 456 S.E.2d 469, 482 n. 14 (1995).

*State ex rel. Riffle v. Ranson*, 195 W. Va. 121, 128, 464 S.E.2d 763, 770 (1995).

On the other hand, the administrative certification/decertification provisions provide that the Subcommittee or its designee "may decertify or reactivate a law-enforcement officer pursuant to the procedure contained in [Article 29] and legislative rules

19

promulgated by the [S]ubcommittee." W. Va. Code §30-29-5(h). The accompanying legislative rules further demonstrate that the Legislature intended for these two statutory schemes to work independently of each other. For example, West Virginia Code of State Rules § 149-2-16.2 provides that "[e]mployment by another agency or reinstatement of a law enforcement officer by his parent agency after termination, whether termination was voluntary or involuntary, does not preclude suspension, revocation or denial of law enforcement certification, if the law enforcement officer was terminated for any of the reasons contained in this section." Additionally, West Virginia Code of State Rules § 149-2-16.3 provides that "[t]ermination of a law enforcement officer, whether voluntary or involuntary, does not preclude suspension, revocation or denial of law enforcement certification, if the officer was terminated for any reasons contained in this section." Moreover, West Virginia Code of State Rules § 149-2-16.4 demonstrates how these two schemes are to be applied independently: "[a]n employing agency shall not seek de-certification of a law-enforcement officer prior to or in lieu of termination." As such, the language utilized by the Legislature shows how the civil service provisions have no bearing on the decertification provisions and when the decertification process can be initiated.

Mr. Ward has cited to no language of the statutory framework or the accompanying legislative rules that definitively state that a law enforcement officer must undergo the hearing procedures of the civil service statute prior to the Subcommittee or its designee obtaining its authority to begin the decertification process. Accordingly, the clear

20

and unambiguous statutory language demonstrates that these two statutory schemes have different purposes and function independently of each other.

Additionally, the Executive Director argues that "the circuit court's conclusion that termination *must* precede decertification would render the other sections—specifically, sections ignored in the circuit court's analysis—redundant." We agree. As discussed above, the circuit court analyzed and applied the wrong statutory provisions. Accordingly, the circuit court failed to consider West Virginia Code § 30-29-11[20], which provides for procedures to be followed when decertifying law enforcement officers who are separated from their employment. If decertification can occur only post-termination, then the provisions of West Virginia Code § 30-29-11 would be redundant and meaningless. We have previously held that "'[i]t is always presumed that the legislature will not enact a meaningless or useless statute.'" *Matheny v. Scolapio*, 240 W. Va. 30, 39, 807 S.E.2d 278, 287 (2017) (quoting Syl. pt. 4, *State ex rel. Hardesty v. Aracoma-Chief Logan No. 4523, Veterans of Foreign Wars of the United States, Inc.*, 147 W. Va. 645, 129 S.E.2d 921 (1963)).

Lastly, we note that both statutory schemes provide for their own due process protections.[21] The civil service provisions provide for notice, including a written statement

---

[20] The circuit court instead analyzed West Virginia Code § 30-29-3(a)(11).

[21] Because the circuit court erroneously subordinated the decertification statutes to the civil service statutes, the circuit court did not address any claim regarding

21

of charges; ability to answer the statement of charges; if demanded, a public hearing; ability to be represented by legal counsel; written record of all testimony; and right of appeal to the circuit court. *See* W. Va. Code § 8-14-20(a).

The decertification provisions also provide for due process protections. In particular, the legislative rules, approved by the Legislature, outline the specific reasons that a certification may be revoked. W. Va. Code R. § 149-2-16. The legislative rules further provide that "an officer or individual whose certification as a law enforcement officer . . . has been denied, suspended or decertified pursuant to a final decision of the Subcommittee, may appeal that final decision of the Subcommittee to the Governor's Committee on Crime, Delinquency and Correction." W. Va. Code R. § 149-2-20. Additionally, the procedural rules contained in West Virginia Code of State Rules §§ 149-1-1 *et seq.* provide for all procedural protections outlined in the Administrative Procedures Act. These protections include, but are not limited to: a hearing if demanded; ability to be represented by counsel; ability to submit evidence including testimony, papers, records, and documents; ability to cross-examine witnesses, submit rebuttal evidence, right to offer argument; official transcription of reported testimony and evidence; submission of proposed findings of fact and conclusions of law; appointment of a hearing examiner; and judicial review of any adverse final decision. *Id.*

---

the sufficiency of due process under the decertification statutory framework. Accordingly, we do not address the sufficiency of these statutes in this case.

22

As such, both of these statutory schemes protect two separate and independent interests: employment protections and the regulation of mandatory professional certifications. Neither of these statutory schemes are subordinate to the other, but each has their own procedure and protections. Therefore, the circuit court erred when it determined that the civil service statutory scheme must always precede a law enforcement officer's decertification proceeding.[22] Consequently, we reverse the circuit court's January 23, 2018 Final Order reversing the November 10, 2016 Executive Director's Written Decision decertifying Mr. Ward as a law enforcement officer in the State of West Virginia.[23]

---

[22] This is consistent with other courts as well. *See Pangallo v. Kentucky Law Enf't Council*, 106 S.W.3d 474, 477 (Ky. Ct. App. 2003) (finding that because a law enforcement officer waived his right to a due process procedures applicable to the termination of a police officer did not also waive his right to due process procedures regarding his law enforcement certification); *Hannigan v. Mun. Police Officers' Educ. & Training Comm'n*, No. 612 C.D. 2011, 2012 WL 5286230, at *8 (Pa. Commw. Ct. July 5, 2012) ("There is no conflict between the Commission's authority to decertify a police officer and the borough civil service commission's authority to remove a police officer from the police force. *A revocation of certification and a disciplinary action taken by the civil service commission are subject to separate due process hearings under the respective statutes.* The Commission did not terminate Hannigan's employment in this proceeding. Although his decertification may eventually lead to a separate personnel action, the Commission did not usurp the civil service commission's authority." (emphasis added)).

[23] While the Executive Director raised only two assignments of error in his opening brief, which we addressed in turn above, he also generally argued that none of Mr. Ward's other objections to the procedure utilized by the Subcommittee and the Executive Director constitute a sufficient basis to affirm the judgment of the circuit court. We decline to address this non-assignment of error. As acknowledged by the Executive Director, the circuit court did not reach any final decision on these additional procedural issues. *See Skaggs v. E. Associated Coal Corp.*, 212 W. Va. 248, 256 n.3, 569 S.E.2d 769, 777 n.3 (2002) ("Because the circuit court did not reach the merits of these [contentions] by the plaintiff, we decline to address them[.]"). Additionally, Mr. Ward raises a litany of issues in his response brief that the circuit court also did not reach on the merits. It is well-settled

23

## IV.

## CONCLUSION

For the reasons set forth above, the January 24, 2018 Final Order of the Circuit Court of Ohio County reversing the November 10, 2016 order of the Executive Director decertifying Mr. Ward as a law enforcement officer in the State of West Virginia is reversed, and this case is remanded to the circuit court to vacate its order reversing the Executive Director's Written Decision and for further proceedings consistent with this opinion.

Reversed and Remanded.

---

that "[i]n the exercise of its appellate jurisdiction, this Court will not decide non[-]jurisdictional questions which were not considered and decided by the court from which the appeal has been taken." Syl. pt. 1, *Mowery v. Hitt*, 155 W. Va. 103, 181 S.E.2d 334 (1971). As such, we decline to address those issues.